# REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

## BLACKBERRY LIMITED'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT

QUINN EMANUEL URQUHART & SULLIVAN, LLP
James R. Asperger (Bar No. 83188)
jamesasperger@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Kevin P.B. Johnson (Bar No. 177129)
kevinjohnson@quinnemanuel.com
Ray R. Zado (Bar No. 208501)
rayzado@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California  94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Attorneys for Plaintiff BLACKBERRY LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| BLACKBERRY LIMITED, a Canadian corporation, <br><br> Plaintiff, <br><br> vs. <br><br> TYPO PRODUCTS LLC, a Nevada limited liability company, <br><br> Defendant. | Case No. 3:14-cv-00023-WHO <br><br> **BLACKBERRY LIMITED'S NOTICE OF MOTION AND MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |

1

## NOTICE OF MOTION AND MOTION

2    TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

3           PLEASE TAKE NOTICE THAT on March 5, 2014, at 9:30 a.m., or as soon thereafter as

4    this matter may be heard, in Courtroom 2 of the above-entitled Court, located at 450 Golden

5    Gate Avenue, San Francisco, CA 94102, Plaintiff BlackBerry Limited ("BlackBerry") will, and

6    hereby does, move for a preliminary injunction prohibiting Defendant Typo Products LLC

7    ("Typo"), from making, using, offering to sell, or selling within the United States, or importing

8    into the United States, the Typo Keyboard product.

9           This motion is based on this Notice of Motion and Motion, the accompanying

10   memorandum of points and authorities, the concurrently filed declarations of Sam Lucente,

11   David Rempel, William Douglas, Joseph Hofer, and Brice Lynch, and all other papers and

12   arguments submitted in connection with this matter and any matters of which the Court may take

13   judicial notice.

14

     DATED:   January 22, 2014          QUINN EMANUEL URQUHART &
15                                       SULLIVAN, LLP

16

17                                       By   /s/ Kevin P.B. Johnson
                                             Kevin P. B. Johnson
18                                           Attorney for BlackBerry Limited

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................1

II.   STATEMENT OF FACTS .......................................................................3

     A.    BlackBerry's Keyboard Design ................................................3

     B.    The Infringing Typo Keyboard ................................................5

           1.    Importation, Use, and Sale of the Infringing Typo Keyboard ......................7

III.  PRELIMINARY INJUNCTION STANDARD....................................................8

IV.  BLACKBERRY IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS...........8

     A.    BlackBerry is Likely to Succeed on its Design Patent Infringement Claim.............8

           1.    Design Patent Infringement Standard .........................................8

           2.    Disclosure of the D'775 Patent ...............................................10

           3.    The D'775 Patent Does Not Require Written Claim Construction.............11

           4.    BlackBerry Is Likely To Prove At Trial That The Typo Keyboard Infringes The D'775 Patent....................11

           5.    BlackBerry is Likely to Prevail on Validity of the D'775 Patent at Trial.......13

     B.    BlackBerry is Likely to Succeed on its '964 Patent Infringement Claim...............14

           1.    Utility Patent Infringement Standard .........................................14

           2.    Disclosure of the '964 Patent .................................................14

           3.    The '964 Patent Does Not Present Any Terms Requiring Construction.............15

           4.    BlackBerry Is Likely To Prove At Trial That The Typo Keyboard Infringes .......................16

           5.    BlackBerry Is Likely to Prevail on Validity of the '964 Patent.................18

V.   A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM ....................................................19

     A.    BlackBerry Will Be Irreparably Harmed if Typo is Allowed to Trade Off of BlackBerry's Goodwill and Erode BlackBerry's Customer Base ..........................19

1. <u>BlackBerry Has Made Significant Investment in Developing Goodwill With Its Customers Relating to its Brand and Its Keyboard Design</u> ............................................................................20

2. <u>There Is No Way To Adequately Calculate The Loss Of Business Opportunities And Goodwill Resulting From Typo's Infringement</u> ..........21

VI. THE BALANCE OF EQUITIES FAVORS BLACKBERRY ...........................................24

VII. A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST .........................25

VIII. CONCLUSION.............................................................................................................25

BLACKBERRY LIMITED'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abbott Labs. v. Sandoz, Inc.,*
    544 F.3d 1341 (Fed. Cir. 2008)...........................................................................................8, 19

*Acumed LLC v. Stryker Corp.,*
    551 F.3d 1323 (Fed. Cir. 2008)...................................................................................................8

*Alacritech, Inc. v. Microsoft Corp.,*
    Case No. 04-03284, 2005 WL 850729 (N.D. Cal. Apr. 12, 2005) ...........................................22

*Allen Eng'g Corp. v. Bartell Indus., Inc.,*
    299 F.3d 1336 (Fed. Cir. 2002).................................................................................................14

*Amini Innovation Corp. v. Anthony California, Inc.,*
    439 F.3d 1365 (Fed. Cir. 2006)...................................................................................................9

*Arminak & Assocs. v. Saint-Gobain Calmar, Inc.,*
    501 F.3d 1314 (Fed. Cir. 2007)...................................................................................................9

*AstraZeneca LP v. Apotex Corp.,*
    633 F.3d 1042 ...........................................................................................................................19

*Best Lock Corp. v. Ilco Unican Corp.,*
    94 F.3d 1563 (Fed. Cir. 1996).....................................................................................................9

*Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.,*
    249 F.3d 1341 (Fed. Cir. 2001).................................................................................................15

*Canon Computer Systems, Inc. v. Nu-Kote Intern., Inc.,*
    134 F.3d 1085 (Fed. Cir. 2001).................................................................................................13

*Catalina Lighting v. Lamps Plus,*
    295 F.3d 1277 (Fed. Cir. 2002).................................................................................................13

*Celsis In Vitro, Inc. v. CellzDirect, Ind.,*
    664 F.3d 922 (Fed. Cir. 2012).............................................................................8, 19, 22, 24, 25

*Clamp Swing Pricing Co. v. Super Market Merchandising and Supply, Inc.,*
    Case No. 13-CV-04515, 2013 WL 6199155 (N.D. Cal. Nov. 21, 2013)..................................22

*Crocs, Inc. v. Int'l Trade Commission,*
    598 F.3d 1294 (Fed. Cir. 2010).................................................................................................11

*Cybor Corp. v. FAS Techs., Inc.,*
    138 F.3d 1448 (Fed. Cir. 1998).................................................................................................14

*Douglas Dynamics, LLC v. Buyers Products Co.,*
    717 F.3d 1336 (Fed. Cir. 2013).................................................................................................20

*Egyptian Goddess, Inc. v. Swisa, Inc.,*
    543 F.3d 665 (Fed. Cir. 2008)...........................................................................................8, 9, 11

*Elantech Devices Corp. v. Synaptics, Inc.*
   2008 WL 1734748 (N.D. Cal. Apr. 14, 2008) .......................................................................24

*Gorham Co. v. White*,
   81 U.S. 511 (1871) ...................................................................................................................8

*Graham v. John Deere Co.*,
   383 U.S. 1 (1966) ...................................................................................................................13

*Hoop v. Hoop*,
   279 F.3d 1004 (Fed. Cir. 2002) ................................................................................................8

*Hybritech, Inc. v. Abbott Labs.*,
   849 F.2d 1446 (Fed.Cir. 1988) ...............................................................................................24

*Int'l Seaway Trading Corp. v. Walgreens Corp.*,
   589 F.3d 1233 (Fed. Cir. 2009) ..........................................................................................9, 13

*L.A. Gear v. Thom McAn Shoe Co.*,
   988 F.2d 1117 (Fed. Cir. 1993) ......................................................................................9, 10,13

*Mentor H/S, Inc. v. Medical Device Alliance, Inc.*,
   244 F.3d 1365 (Fed. Cir. 2001) ........................................................................................15, 16

*Payless Shoesource, Inc. v. Reebok Int'l, Ltd.*,
   998 F.2d 985 (Fed. Cir. 1993) ..................................................................................................9

*QBAS Co., Ltd. v. C Walters Intercoastal Corp., Case No. SACV 10-406*,
   2010 WL 7785955 (C.D. Cal. Dec. 16, 2010) ...........................................................13, 19, 25

*Research In Motion Ltd. v. Motorola, Inc.*,
   Case No. 3:2009-cv-00072 (N.D. Tex.) ..................................................................................18

*Richardson v. Stanley Works, Inc.*,
   597 F.3d 1288 (Fed. Cir. 2010) ................................................................................................9

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) ........................................................................................21, 24

*Trak, Inc. v. Benner Ski KG*,
   475 F. Supp. 1076 (D. Mass. 1979) ........................................................................................25

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
   699 F.3d 1340 (Fed. Cir. 2012) ..............................................................................................14

*TruePosition Inc. v. Andrew Corp.*,
   568 F. Supp. 2d 500 (D.Del. 2008) .........................................................................................21

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) ..............................................................................................15

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ......................................................................................................................8

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

iv

## **Statutes**

35 U.S.C. § 154(a)(1)............................................................................................................8

35 U.S.C. § 271..................................................................................................................11

35 U.S.C. § 271(a)..............................................................................................................14

35 U.S.C. § 282..................................................................................................................13

35 U.S.C. § 283....................................................................................................................8

# I.    INTRODUCTION

Typo has imported, marketed, offered for sale and pre-sold an add-on keyboard for the iPhone that intentionally copies and infringes BlackBerry's iconic keyboard design as embodied in U.S. Design Patent D685,775 (the "D'775 patent") and misappropriates BlackBerry's inventions protected by U.S. Patent No. 7,629,964 (the "'964 patent").  To protect its valuable intellectual property and prevent irreparable injury to its business and its goodwill, BlackBerry respectfully moves for a preliminary injunction preventing Typo from engaging in these unlawful activities.

The keyboard is one of the key pillars of BlackBerry's value proposition to its customers.  Since the late 1990s, BlackBerry has developed and released a series of game-changing handheld mobile devices with physical keyboards, enabling users to send and receive email on the go.  Indeed, BlackBerry has invested millions of dollars over the past 20 years in the development of its keyboard design, and has been a driving force behind today's multi-billion dollar smartphone industry.  BlackBerry's innovation has been recognized through the USPTO's granting of multiple utility and design patents on its keyboard design.  Because of its long history in providing mobile email access, BlackBerry has become readily identified with physical keyboards used in handheld devices, and its keyboard design has been recognized as "iconic" and praised as the standard by which all other handheld keyboard products are judged.

Recognizing BlackBerry's superior keyboard design and typing experience, Typo and its founders developed a business model based on the premise that its product would eliminate the need to have two devices:  an iPhone plus a "phone for typing," i.e., a BlackBerry.  However, rather than develop a novel keyboard for the iPhone, Typo created a knock-off of BlackBerry's keyboard used in its current Q10 smartphone (an embodiment of the D'775 patent) as seen below:



| BlackBerry Q10 | Typo Keyboard |

Not surprisingly, third parties readily observe that the Typo keyboard product "mimics the look and performance of BlackBerry's tactile keyboards," that "the [Typo] keyboard itself looks like it's been lifted straight from a BlackBerry Q10," and that the Typo Keyboard appears to "rip off the BlackBerry keyboard."   In fact, at the recent Consumer Electronics Show in Las Vegas, numerous people misidentified the Typo keyboard as a BlackBerry device and this actual consumer confusion was documented on video.

As demonstrated herein, BlackBerry is likely to succeed in proving that the Typo add-on keyboard infringes the claim of the D'775 patent and claims 19, 20, and 24 of the '964 patent, and that the asserted claims of those patents are valid.  Moreover, the straightforwardness of the claimed ornamental design and keyboard features and Typo's obvious copying make the case for infringement clear based on analysis of a Typo keyboard without discovery or claim construction.

Typo's blatant copying of BlackBerry's keyboard presents an imminent threat of irreparable harm to BlackBerry, and that threat is magnified in combination with the significant market power of the iPhone.  As one third party reviewer noted: "[Typo founder] Ryan Seacrest is looking to kill off the [BlackBerry] smartphone brand all together with his latest investment – a BlackBerry-styled keyboard case that attaches to your iPhone to give iPhone 5 and iPhone 5s owners a physical, hardware keyboard."  Because of the unique economics of the smartphone market – where customer loyalty and onerous penalties for terminating cell service contracts create impediments that exacerbate the harm of a lost sale – the Typo keyboard threatens BlackBerry's position with its customers and in the marketplace.  Further, the inferior Typo product, which reviewers have characterized as "a cheap knockoff of a BlackBerry keyboard," trades on BlackBerry's hard fought goodwill with its customers, based on twenty years of significant investment in innovative product design, marketing and advertising, and performance.

The case for a preliminary injunction is compelling.   Typo's infringing keyboard case will cause irreparable harm to BlackBerry if not enjoined, and the balance of the equities and the public interest favor a preliminary injunction on a product that apparently has been offered for sale and sold but has not yet begun shipping to customers.

## II.   STATEMENT OF FACTS

### A.   BlackBerry's Keyboard Design

BlackBerry was founded in 1984 in Waterloo, Ontario by two engineering students, Mike Lazaridis and Douglas Fregin.   Declaration of Brice C Lynch ("Lynch") Ex. 5.   From its modest beginnings more than 30 years ago, BlackBerry now offers a portfolio of award-winning products, services, and embedded technologies to tens of millions of individual consumers and organizations around the world, including governments, educational institutions, and over 90% of Fortune 500 companies.    Lynch Exs. 5-7.   By transforming the way people communicate, BlackBerry laid a foundation for today's multibillion-dollar modern smartphone industry.   Declaration of William Douglas ("Douglas Dec.") ¶¶3-4.

BlackBerry has been recognized as a leader in the design and the ergonomic aspects of mobile handheld devices.   In particular, BlackBerry has devoted substantial resources and research to the development of a critical aspect of a mobile device's user interface: the keyboard. *See* Hofer Dec. ¶¶5-6, 15-16.   BlackBerry's physical keyboard designs have been recognized by the press and public as "iconic" and a significant market differentiator. Douglas Dec. ¶8, Exs. 1-2.

In the late 1990s, BlackBerry released a series of game-changing handheld devices with physical keyboards, such as the RIM 950 Wireless Handheld device.   Lynch Ex. 5; Douglas Dec. ¶3.   The innovative nature of these devices was instantly recognized, garnering both an Editor's Choice Award from CNET and Andrew Seybold's Outlook Award.   Lynch Exs.. 5*,* 49-50.   In particular, the press praised the RIM 950's keyboard for its advanced ergonomic features, including an easy-to-type-on keyboard layout despite its miniature size.   Lynch Exs. 9-10. BlackBerry further sought patent protection on the keyboard design as embodied in the RIM 950, for example, which led to the '964 patent.   *See* Declaration of David M. Rempel ("Rempel Dec.") ¶¶49-50, 102, 105-07.

In 2002, BlackBerry released the BlackBerry 6710 and 6720 – the first BlackBerry devices capable of both sending emails and making phone calls.   Lynch Ex. 5; Douglas Dec. ¶4.   The next year, BlackBerry introduced smartphone models that added built-in audio hardware and color screens.   Lynch Ex. 5; *see* Douglas Dec. ¶4.   Since those first smartphones, BlackBerry has

1   continued to offer handheld wireless products incorporating its distinctive keyboard designs,

2   including the 7000 series and 8000 series, as well as the Electron, Curve, and Tour products.

3   Lynch Exs. 5 and 11; Rempel Dec. ¶108; Douglas Dec. ¶4-5.

4       In 2008, BlackBerry introduced the first of its Bold line of smartphones, the 9000.

5   Douglas Dec. ¶6; Hofer Dec. ¶5.   The Bold 9000 featured an updated housing design, more robust

6   software, and a specially designed physical keyboard with keys having sculpted surfaces designed

7   to have a distinctive visual appearance while being optimized for thumb-typing.   This unique and

8   distinctive keyboard was known within BlackBerry as an ergonomic surface keyboard, or "Ergo

9   Surf" for short.   Hofer Dec. ¶6; *see* Douglas Dec. ¶6.   The distinctive look of the BlackBerry

10  Bold was designed to create the impression that the Bold 9000 was a high-end mobile device, and

11  to create an emotional appeal that makes the design more approachable than a sea of multiple

12  buttons and keys.   Hofer Dec. ¶¶5-6.   The central design elements of the Ergo Surf keyboard

13  have been used in every BlackBerry flagship device since 2008.   *Id.* ¶9.

14      More recently, in June 2013, BlackBerry released the Q10, the latest iteration of its

15  wireless, keyboard-based products.   The Q10 incorporates both a modern touch-screen and the

16  iconic BlackBerry physical keyboard.   The Q10's physical keyboard continues to incorporate bars

17  above the rows of keys having the distinctive sculpted appearance of the thumb-optimized ergo-

18  surf design that was first introduced with the Bold 9000.   Hofer Dec. ¶11.

19      BlackBerry has spent substantial resources on the design of its keyboard products.   *See*

20  Hofer Dec. ¶14.   For example, the design process for the original Bold 9000 and its Ergo Surf

21  keyboard lasted approximately two years, and involved many of the employees in the BlackBerry

22  Design Department.[1]   *Id.* ¶15.   Similarly, the Q10 design effort started in 2011 and lasted well

23  over one year, again involving many Design department members.   *Id*. ¶16.   While these later

24  generations of products included refinements to the overall BlackBerry keyboard design, all these

25  subsequent generations of products include the distinctive design elements to make them

26  identifiable as uniquely BlackBerry.   *Id*. ¶¶9, 11-13.

27

28
---
[1]   The Design department at BlackBerry incorporates industrial design, user experience design, and design planning groups, and included upwards of 90 employees at the time.

Each of these successive iterations of BlackBerry's wireless devices has received industry praise and awards, particularly for its keyboard layout and design.   Indeed, as CNET noted, "the keyboard is arguably the star of any BlackBerry product."   Lynch Ex. 12. These awards include: the GSMA Chairman's Award, InfoWorld Magazine's Product of the Year Award, PC World's World Class Award, the Network Industry Award for Best New Mobile Communications Product, and BusinessWeek's Best Product of the Year award.   Lynch Exs. 5, 13, 43- 46.

As a direct result of its innovative and distinctive keyboard designs, BlackBerry's devices have achieved overwhelming commercial success in the marketplace over the years. ███████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ █

███████████████████████████                    Douglas Dec. ¶13.

BlackBerry's keyboard has further become uniquely associated with the BlackBerry name. Douglas Dec. ¶¶7-12.  As noted by Business Insider and eWeek (among others), BlackBerry's keyboard design has become so identifiable in the industry as to be referred to as "iconic." Douglas Dec. ¶8, Exs. 1-2.  In addition to the numerous industry awards and recognition, BlackBerry has invested heavily in the advertising and marketing of its keyboard devices. BlackBerry has advertised these products in virtually every form of media, including television, newspapers, magazines and other publications, and the Internet. ████████████████████

███████████████████████████████████████████                    Douglas Dec. ¶10.

   ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████    Douglas Dec. ¶9.

**B.    The Infringing Typo Keyboard**

Typo was founded in or about 2013 by Laurence Hallier and Ryan Seacrest. Lynch Exs. 4 and 14.  Mr. Seacrest was known for his longtime use of BlackBerry products.  Lynch Exs. 15 and 16.  Typo's founders created the Typo Keyboard specifically to replace their BlackBerry

---

[2]   Each of these products practices the '964 patent.   Rempel Dec. ¶¶ 103-17.

devices with a physical keyboard copied from a BlackBerry.   As noted on Typo's website:

> For several years, many of our friends and colleagues carried two phones: one for typing and correspondence and an iPhone for virtually everything else. One night, we went out to dinner and both had our phones on the table.
>
> Two people, four phones!  We looked at each other and thought there was an easy solution to the problem, a keyboard for the iPhone. After ordering every iPhone keyboard available, we realized that there was no solution that worked well.
>
> That's when we decided to take matters into our own hands and the Typo Keyboard™ was born.

Lynch Ex. 4.   Thus, while alternative designs for physical keyboard add-on products were available, Typo's founders realized none of them performed as well as their BlackBerry devices. Typo's founders therefore elected to copy the BlackBerry keyboard, including the keyboard layout and the surface shaping of the keys.   As co-founder Ryan Seacrest stated in an interview by CNN about the Typo Keyboard on or about December 9, 2013.   (Lynch ¶48):

> Interviewer:          So it's the best thing about a BlackBerry, within the iPhone.
> Ryan Seacrest:      That's kind of how this came to fruition.

The result is an obvious knock-off of the BlackBerry keyboard.   At the Consumer Electronics Show in Las Vegas held on January 7-10, 2014, numerous consumers were presented with the Typo keyboard and misidentified it as a BlackBerry device.   *See* Lynch ¶49.   This actual consumer confusion was documented on video, along with a detailed third party description of the deceptive similarity of the Typo Keyboard to the BlackBerry Q10.   *See* Lynch Ex. 48; ¶49.

Many other industry and analyst reviews also acknowledge Typo's blatant copying:

- "The keyboard itself looks like it's been lifted straight from a BlackBerry Q10 (They say imitation is the sincerest form of flattery)…" (Lynch Ex. 17);
- "It's no secret which company Typo is trying to emulate with its product. … even objectively—from the size of the buttons down to the sculpted slope on each key— [the Typo product is] almost an exact replica" of BlackBerry's keyboard (Lynch Ex. 42);
- "It's hard not to think of the BlackBerry when you look at and use the TYPO" (Lynch Ex. 35);
- "The Bluetooth case turns an Apple handset into a makeshift BlackBerry Q10" (Lynch Ex. 19);
- "iPhone users can now get a similar look and feel with the new Typo Keyboard Case that effectively turns their beloved smartphone into something that resembles the BlackBerry Q10 (and many other BlackBerry devices)" (Lynch Ex. 20);
- "The keyboard has the look and feel of a classic BlackBerry, right down to the

beveled keys" (Lynch Ex. 22);

- "If you thought Typo's iPhone keyboard looked an awful lot like the keyboard from a BlackBerry Q10, you're not alone. … it's hard to deny the strong resemblance." (Lynch Ex. 41).

However, while the Typo product copies BlackBerry's unique keyboard design, reviewers have noted the Typo product's performance is highly flawed, calling it a "cheap knockoff":

- "But the only thing that really matters is that ***the Typo isn't a good keyboard***. Its four rows of backlit, angled, slightly raised black keys with white letters and borders may look suspiciously (and perhaps illegally) like they were lifted from a BlackBerry, but there's no confusing the two. The Typo's keys wobble in place, and have too much travel and a harsh, ugly bottoming-out feeling. … ***The Typo feels like a cheap knockoff of a BlackBerry keyboard***, like someone thought all that mattered was the shape of the keys and the font styling" (Lynch Ex. 36) (emphasis added);

- "[The Typo keyboard] is essentially an overpriced, underdeveloped knockoff, a kitschy accessory that somehow found a mainstream audience because Ryan Seacrest got interested. ***The Typo is in every imaginable way a bad product. It does only a few things that it logically should, and it does those few things poorly***" (*Id*) (emphasis added);

- "***That cramped, carpal-tunnel feeling***. If Apple's touch keyboard is tough to type on because of its size, then ***the Typo is maddening***. … ***The buttons are very small, and very plasticky***. …. Ironically, ***using the Typo lead to a dramatic increase in my own typos***. … [W]hen you type, the device is very top heavy, which could lead to some falls" (Lynch Ex 37) (emphasis added);

- "I had other issues with Typo. ***… The keyboard itself is overly plastic-y.*** *I like the clicking of keys more than most, but* ***these made so much noise, I couldn't inconspicuously type during a meeting***. The case makes the phone top heavy." (Lynch Ex. 38) (emphasis added).

### 1.   Importation, Use, and Sale of the Infringing Typo Keyboard

According to the Typo website, the Typo Keyboard was designed, engineered, and tested (i.e. used) in the United States (specifically in California and Utah). *See* Rempel Dec. ¶¶4, 25, 102; Lynch Ex. 4 (website).   Because the Typo Keyboard is made in China (*see* Lynch Ex. 4), it further must be imported into the United States before being distributed here.

While Typo has not begun shipping, it has demonstrated the Typo Keyboard at CES. Lynch Exs. 23- 24.   The Typo Keyboard product is also available for pre-order via two methods: one through the Typo website, and one through online retailer Amazon.   Lynch Ex. 23.   In both methods, payment is charged upon placement of the pre-order, rather than upon shipment of the device.   Shipping is advertised as set to begin in January 2014, and Typo is now boasting on its website the initial batch of Typo Keyboards has sold out.   *See* Rempel Dec. ¶27; Lynch Ex. 4.

## III.   PRELIMINARY INJUNCTION STANDARD

"The essential attribute of a patent grant is that it provides a right to exclude competitors from infringing the patent."   *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008) (citing 35 U.S.C. § 154(a)(1)).   Thus, infringement "may cause a patentee irreparable harm not remediable by a reasonable royalty," (*id.*) including harm "that no damages payment, however great, could address."   *Celsis In Vitro, Inc. v. CellzDirect, Ind.*, 664 F.3d 922, 930 (Fed. Cir. 2012).   In cases of patent infringement, a court "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."   35 U.S.C. § 283.   Courts have issued preliminary injunctions in both utility and design patent cases.   *E.g. Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1343 (Fed. Cir. 2008)(affirming preliminary injunction in utility patent case); *Hoop v. Hoop*, 279 F.3d 1004, 1008 (Fed. Cir. 2002) (affirming preliminary injunction in design patent case).

A patentee seeking a preliminary injunction must establish that: (1) it is likely to succeed on the merits; (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor;" and (4) an injunction is in the public interest.   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 25 (2008).

## IV.   BLACKBERRY IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.   BlackBerry is Likely to Succeed on its Design Patent Infringement Claim

#### 1.   Design Patent Infringement Standard

The test for design patent infringement is "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other."   *Gorham Co. v. White*, 81 U.S. 511, 528 (1871); *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670, 682 (Fed. Cir. 2008) (en banc) (design patent infringement occurs where "an ordinary observer, taking into account the prior art, would believe the accused design to be the same as the patented design.").

In conducting its infringement comparison, a court must "analyz[e] the design as a whole," comparing the overall appearance of the design patent with that of the accused device, not

BLACKBERRY LIMITED'S MOTION FOR A PRELIMINARY INJUNCTION

1    "mistakenly analyz[ing] each element separately."  *Amini Innovation Corp. v. Anthony California,*

2    *Inc.*, 439 F.3d 1365, 1372 (Fed. Cir. 2006).   "[T]he mandated overall comparison is a comparison

3    taking into account significant differences between the two designs, not minor or trivial

4    differences that necessarily exist between any two designs that are not exact copies of one

5    another."  *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1243 (Fed. Cir. 2009);

6    *Payless Shoesource, Inc. v. Reebok Int'l, Ltd.*, 998 F.2d 985, 991 (Fed. Cir. 1993).

7         The hypothetical ordinary observer, from whose perspective the design patent comparison

8    is made, is "a person who is either a purchaser of, or sufficiently interested in, the item that

9    displays the patented designs."  *Arminak & Assocs. v. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314,

10   1323 (Fed. Cir. 2007).   The ordinary observer is also one who is "conversant with the prior art,"

11   and when comparing the claimed and accused devices in light of the prior art, "the attention of the

12   hypothetical ordinary observer will be drawn to those aspects of the claimed design that differ

13   from the prior art."  *Egyptian Goddess, 543 F.3d at 676, 678*.   Thus, "[i]f the accused design has

14   copied a particular feature of the claimed design that departs conspicuously from the prior art, the

15   accused design is naturally more likely to be regarded as deceptively similar to the claimed design,

16   and thus infringing."  *Id*. at 677.   The accused infringer bears the burden of identifying prior art

17   relevant to the infringement comparison.  *Id*. at 678-79.

18        In conducting the infringement analysis, the Court considers all of the ornamental aspects

19   of the design, and may only factor out an element if its particular design was dictated by its

20   function.  *Richardson v. Stanley Works, Inc.*, 597 F.3d 1288, 1293-94 (Fed. Cir. 2010).   Simply

21   because the article or an element of its design serves a functional purpose does not mean that the

22   design of the article or element is therefore functional.  *L.A. Gear v. Thom McAn Shoe Co.*, 988

23   F.2d 1117, 1123 (Fed. Cir. 1993).   The existence of alternative designs indicates that a design or

24   design element is likely not functional.  *Id*.   ("When there are several ways to achieve the

25   function of an article of manufacture, the design of the article is more likely to serve a primarily

26   ornamental purpose."); *Best Lock Corp. v. Ilco Unican Corp.*, 94 F.3d 1563, 1566 (Fed. Cir. 1996)

27   ("A design is not dictated solely by its function when alternative designs for the article of

28   manufacture are available.").   It is the accused infringer's burden to prove that an element is

9

functional and must be factored out of the infringement analysis.   *See L.A. Gear*, 988 F.2d at 1123.

And while the design patent infringement test is primarily a comparison between the images in the design patent and the accused article, where a patentee has also produced a physical embodiment that is substantially the same as the design patent, a comparison of "the patentee's and the accused articles directly" is permissible to assist in the analysis of whether the accused products infringe the design at issue.   *See L.A. Gear*, 988 F.2d at 1125-26.

2.    Disclosure of the D'775 Patent

The D'775 Patent (D.I. 1 Ex. C) is directed to the ornamental design of a portion of a handheld electronic device, as claimed in the figures below.



The D'775 design is easily recognized as the BlackBerry Q10's distinctive keyboard.[3] *See* Lucente Dec. ¶¶54-56, 59.   The design is distinctive in its depiction of four horizontal bars or "frets" resting above four rows of rectangular keys.   The uniform keys in the top three rows have sculpted curves that form a symmetrical pattern moving out from a vertical center line.   In the row below the lower most horizontal fret, a larger rectangular key is vertically centered and has a u-shaped planar area, while the surrounding keys have sculpted curves similar to the keys above.

---

[3] Features other than the keyboard are unclaimed, and are therefore not a proper part of any infringement comparison. Lucente Dec. ¶ 32.



FIG.2

As described in detail in the declaration of design expert, Samuel Lucente, the shading used in the design patent shows that the frets have planar surfaces, while all but the largest key in the bottom row have a flat portion that transitions to a sculpted curve on the side closest the middle of the keyboard.   No elements claimed in the D'775 patent are dictated by functional, as is evidenced by the existence of numerous alternative designs, so no elements need to be factored out of the infringement comparison.   Lucente Dec. ¶¶40-49.

### 3.   The D'775 Patent Does Not Require Written Claim Construction

For design patents, there is no need for the Court to provide a detailed written claim construction, because "a detailed verbal description of the claimed design risks undue emphasis on particular features of the design rather than examination of the design as a whole."   *Crocs, Inc. v. Int'l Trade Commission*, 598 F.3d 1294, 1302 (Fed. Cir. 2010).   For this reason, the Court may conduct its infringement analysis by comparing the accused device directly to the D'775 drawings and to the BlackBerry Q10 device.   *See id*.

### 4.   BlackBerry Is Likely To Prove At Trial That The Typo Keyboard Infringes The D'775 Patent

By importing, offering to sell, selling, and using the Typo Keyboard device, Typo infringes the D'775 patent.   35 U.S.C. § 271.   As illustrated below, the Typo Keyboard copies BlackBerry's patented design in such a way that an ordinary observer "would be deceived by the similarity between the claimed and accused designs, 'inducing him to purchase one supposing it to be the other.'"   *Egyptian Goddess*, 543 F.3d at 683; *see* Lucente Dec. ¶¶50-67.[4]

---

[4]   The ordinary observer for the D'775 patent is a person who is a purchaser of, or sufficiently interested in, handheld electronic devices.   *See* Lucente Dec. ¶ 25.   This ordinary observer may be familiar with purchasing such devices either in a retail environment or online. *Id*.

| BlackBerry Q10 | D'775 Patent | Typo Keyboard |
|---|---|---|
|  |  |  |

By incorporating all of the design elements shown in the drawings of the D'775 patent, the overall design of the Typo Keyboard creates a visual impression that is nearly identical to the BlackBerry Q10. Lucente Dec. ¶60. Both the Typo Keyboard and the D'775 patent use four horizontal rows of keys. *Id.* ¶54. The top three rows of keys each have ten roughly square keys with contoured surfaces that are evenly distributed across each row. *Id.* The surface of each key has a planar area and a sculpted area that forms a curve that appears to move away from the vertical center line of the keyboard, and the sculpted curves adjacent to the center line form a v-shaped pattern. *Id.* In addition, both the D'775 patent and Typo Keyboard include horizontal frets above each rows of keys, with keys that protrude beyond the plane of the frets. *Id.* ¶¶54-55.

These numerous design similarities create the impression that the Typo Keyboard is the same design as the D'775 patent. Lucente Dec. ¶57. Both at the individual feature level and the overall impression level, an ordinary consumer observing the Typo Keyboard would be deceived by its similarity to the D'775 patent, such that the consumer could be induced to believe the Typo Keyboard was the D'775 design. *Id.*

This deceptive similarity, which appears to be the result of direct copying, is confirmed by the comments of numerous reviewers and commentators who have also noted the overwhelming likeness between the designs. Lucente Dec. ¶¶61-67; *see* Section II.B., *supra*. The only noticeable difference between the two designs is that the Typo Keyboard adds two small keys to the bottom row, which still maintain the same distinctive BlackBerry D'775 sculpting. Lucente Dec. ¶58. This minor difference is trivial and does not change the overwhelming similarity between the Typo Keyboard and the D'775 patent. *Id.* This is especially true in light of Typo's mimicking of the D'775 patent's distinctive design while rejecting a bevy of other design options.

1    *See id.* ¶¶41-47.   Typo cannot escape design patent infringement by introducing insignificant

2    differences after copying wholesale BlackBerry's overall design.   *Int'l Seaway Trading Corp.*,

3    589 F.3d at 1243; *see also* Lucente Dec. ¶¶21, 58.

4              5.      BlackBerry is Likely to Prevail on Validity of the D'775 Patent at Trial

5         All issued patents enjoy the same presumption of validity during preliminary injunction

6    proceedings as at other stages of litigation.   *See Canon Computer Systems, Inc. v. Nu-Kote Intern.,*

7    *Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 2001); 35 U.S.C. § 282.   Invalidity of a design patent must

8    be established by clear and convincing evidence.   *L.A. Gear*, 988 F.2d at 1123.   As the accused

9    infringer, Typo bears the initial burden of overcoming the presumption of validity by producing

10   evidence of invalidity at the preliminary injunction stage.   *See Canon*, 134 F.3d at 1088; *QBAS*

11   *Co., Ltd. v. C Walters Intercoastal Corp.,* Case No. SACV 10–406, 2010 WL 7785955 at *14

12   (C.D. Cal. Dec. 16, 2010) ("Only after the alleged infringer responds to the [preliminary

13   injunction] motion by attacking validity must the patentee respond with evidence and argument

14   that the patent is, in fact, valid.")

15        Thus, the presumption on its own can be sufficient to meet BlackBerry's burden of

16   showing a likelihood of success on validity: "where the challenger fails to identify any persuasive

17   evidence of invalidity, the very existence of the patent satisfies the patentee's burden on the

18   validity issue."   *Canon*, 134 F.3d at 1088.   If Typo does attempt to challenge validity of the

19   design patent, the same ordinary observer test used for infringement applies.   Only a prior art

20   design, or an obvious modification of a prior design, that is deceptively similar to the D'775 patent

21   could render it invalid.   *See Int'l Seaway*, 589 F.3d at 1240-41.

22        BlackBerry is not aware of any art that anticipates or renders obvious the claim of the

23   D'775 patent.   *See* Lucente Dec. ¶28.   Further, certain secondary indicia of non-obviousness

24   provide evidence of the validity of the D'775 patent.   For example, the intentional copying of a

25   patented design by a competitor is probative of nonobviousness of the patented design.   *See*

26   *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also Catalina Lighting v. Lamps Plus*,

27   295 F.3d 1277 (Fed. Cir. 2002) (design patent).   As noted above, the Typo Keyboard product

28   appears to be a direct copy of BlackBerry's Q10, which embodies the D'775 design.   *See* Lucente

Dec. ¶¶72-75.   Indeed, the degree of similarity between these products, even down to minute design details, indicates that such copying would have to have been intentional.   *See id.* ¶72

In addition, "industry praise" is evidence of nonobviousness.   *See Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed. Cir. 2012). The BlackBerry Q10 has been the subject of significant industry praise for its keyboard design. For example, the Q10's design was nominated for the Mobile Choice "Best Design" Award, which praised the Q10's "solid build and good looks."  Lynch Ex. 25.   In reviewing the Q10, Business Insider recognized BlackBerry as "the best at making keyboard phones," and identified the Q10 in particular the "best keyboard phone you can buy."   Lynch Ex. 26.   The Q10 was also the only smartphone with a physical keyboard to be nominated for T3's "Phone of the Year Award": "The BlackBerry Q10 sits apart in our awards long list, being the only phone to feature a physical QWERTY keyboard.   And what a keyboard …."   Lynch Ex. 28.   Accordingly, BlackBerry, not Typo, is likely to prevail on validity of the D'775 patent.

### B.   BlackBerry is Likely to Succeed on its '964 Patent Infringement Claim

#### 1.   Utility Patent Infringement Standard

It is an act of infringement to make, use, sell, offer to sell or import an invention covered by the claims of a patent without the authority of the patentee.   35 U.S.C. § 271(a).[5]   A determination of infringement requires a two-step analysis: "First, the court determines the scope and meaning of the patent claims asserted ... and then the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citations omitted).   Literal infringement of a claim exists when every claim limitation "reads on"—or, in other words, is found in—the accused device or method.   *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002).

#### 2.   Disclosure of the '964 Patent

BlackBerry's '964 patent (Lynch Ex. 1) is entitled "Hand-Held Electronic Device With A Keyboard Optimized For Use With The Thumbs."   The '964 patent is generally directed to

---

[5]   For purposes simplicity, BlackBerry is not raising the issue of infringement under the doctrine of equivalents in this motion but reserves the right to do so in this litigation.

physical keyboards for handheld devices (as well as the handheld devices including such keyboards).  (*See, e.g.*, Col. 1:61-65.)  As shown below in the embodiment of Figure 2, the keyboard of the '964 patent was designed to have a symmetrical layout and a relatively small footprint on a handheld device.



*Fig. 2*

The inventors explained that this placement optimizes the keyboard for thumb-typing: "The placement of the keys is designed to enhance the user experience while typing with the thumbs by meeting two seemingly opposite goals—minimizing the keyboard footprint while maximizing the likelihood that proper keys will be struck by the thumb-typing user."  (Col. 3:11-15.)

### 3.   The '964 Patent Does Not Present Any Terms Requiring Construction

While claim construction is a common practice in patent cases, not every claim limitation—or even every claim—requires construction.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (claim construction is not an "obligatory exercise in redundancy").  Claim construction is appropriate to "clarify and when necessary to explain what the patentee covered by the claims."  *Id*.  Here, no formal claim construction is necessary because the claims of the '964 patent use simple, clear terms that should all be accorded their plain and ordinary meaning.  *See Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) ("the meaning of 'melting' does not appear to have required 'construction,' or to depart from its ordinary meaning"); *Mentor H/S, Inc. v. Medical Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (holding that district court properly instructed jury to use ordinary meanings for "irrigating" and "frictional heat").

More particularly, the claimed inventions relate to the mechanical aspects of everyday products that are ubiquitous in their use: keyboards.  Rempel Dec. ¶¶38-46.  Claim 19 recites:

19.   A keyboard for use with a mobile communication device, the keyboard configured in a device housing having a top surfaces the top surface having a left edge and a right edge and being bisected by a vertical reference substantially midway between the left edge and the right edge.

[19A] the keyboard having twenty-six letter keys and at least one other key:

[19B] the twenty six letter keys and the at least one other key being arranged in an upper row, a middle row, and a lower row,

[19C] the letter keys in of the upper row being distributed across the top surface from adjacent the left edge to adjacent the right edge,

[19D] a letter key in the middle row being adjacent the left edge of the housing and the keys in the middle row being distributed across the top surface of the housing from adjacent the left edge to adjacent the right edge,

[19E] the keys in each of the upper, middle and lower rows being arranged so that approximately half of the keys in each of the respective rows are positioned to the left of the vertical reference and approximately half of the keys in each of the respective rows [row] are positioned to the right of the vertical reference,

[19F] five letter keys in the upper row being disposed on each side of the vertical reference, five letter keys in the middle row being disposed on one side of the vertical reference and four letter keys in the middle row being disposed on the other side of the vertical reference, and four letter keys in the lower row being disposed on the one side of the vertical reference line and three letter keys in the lower row being disposed on the other side of the vertical reference line; and

[19G] each letter key in the lower row being substantially vertically aligned with a respective letter key in each of the upper and middle rows.

Each of the asserted claims (claims 19, 20, and 24) use non-technical terms with which the average lay person should be readily familiar, such as "keyboard," "keys," "rows," "edges," "sides," and "same total number"; the plain and ordinary meanings of the terms in those claims are consistent with the meanings that would have been ascribed to the claim terms by those of ordinary skill in the art at the time of the claimed inventions.   *See* Rempel Dec. ¶59.   As a result, no construction of these claim terms is required.   *See, e.g., Mentor*, 244 F.3d at 1380.

4.     BlackBerry Is Likely To Prove At Trial That The Typo Keyboard Infringes

BlackBerry will likely prove that the accused Typo keyboard infringes at least claims 19, 20, and 24 of the '964 patent.   A detailed infringement analysis of these claims are set forth in the Rempel Dec. at paragraphs 62-101.   The accused Typo keyboard is a keyboard for use with a

mobile communication device, *i.e.*, an Apple iPhone 5/5S, and has a top surface with a left and right edge.   *Id.* ¶¶63-67.   The housing with the keyboard is bisected by a vertical reference substantially midway between those two edges—the vertical reference falls between the following keys: T and Y, G and H, and V and B.   *Id.* ¶66.

 

The Typo Keyboard comprises a keyboard having twenty-six letter keys and at least one other key (e.g., ALT or carriage return).   *Id.* ¶¶68-70.   The twenty six letter keys and the at least one other key of the Typo Keyboard are arranged in upper, middle, and lower rows and are distributed across the top surface of the housing from the left edge to the right edge.   *Id.* ¶¶71-78. The keys in each of the upper, middle, and lower rows of the Typo Keyboard are arranged so that half of the keys in each of the respective rows are positioned to the left of the vertical reference and half of the keys in each of the respective rows row are positioned to the right of the vertical reference.   *Id.* ¶¶74-81.   Out of 30 keys in the upper, middle, and lower rows, there are 15 keys on each side of the vertical reference (shown in yellow).   *See id.* ¶¶82-89.



Similarly, the claimed number of letter keys in the upper, middle, and lower rows of the Typo Keyboard located on each side of the vertical reference and the claimed "substantially vertically aligned" letter keys in the lower row compared to the upper and middle rows are

1    apparent from visual inspection of the Typo keyboard shown above.  *Id.* ¶¶90-93.

2         The Typo keyboard also infringes dependent claims 20 and 24 of the '964 patent.   These

3    dependent claims add the following limitations: the upper and middle rows have the same number

4    of keys (claim 20); and at least two of the rows have the same number of keys (claim 24); the

5    Rempel Dec. at paragraphs 94-102 includes a detailed infringement analysis of these claims

6              5.    BlackBerry Is Likely to Prevail on Validity of the '964 Patent

7         BlackBerry is not aware of any prior art that raises any question as to the validity of

8    the '964 patent claims.  *See* Rempel Dec. ¶118.  The claims of the '964 patent were allowed to

9    issue over considerable prior art: indeed, a total of 174 prior art references are cited on the face of

10   the '964 patent, including U.S. and foreign patent documents as well as other publications.

11   Allowance of the '964 patent over such a large volume of cited prior art is evidence of its validity.

12        Moreover, the '964 patent not only overcame prior art cited by the Examiner, but also prior

13   art that had been identified by during litigation by a well-funded and motivated competitor.   In

14   *Research In Motion Ltd. v. Motorola, Inc*., Case No. 3:2009-cv-00072 (N.D. Tex.) ("Motorola

15   Action"), RIM asserted six patents against Motorola; among the six were U.S. Patent Nos.

16   6,278,442, 7,227,536, and 6,611,254, each of which issued from an application in the same chain

17   of priority as the '964 patent. In response to an interrogatory served in that action, Motorola

18   identified alleged prior art to each of the six asserted patents.  *See* Lynch Ex. 3, (August 20, 2009

19   Applicant Arguments, at 20-23.

20        Because the applicants were prosecuting the '964 patent during the Motorola Action, they

21   disclosed the prior art Motorola had identified in that litigation to the Examiner.[6]  The Examiner

22   considered all of the Motorola-identified prior art, but found none of it persuasive.  *See* Lynch Ex.

23   3, (September 25, 2009 Notice of Allowance).   Given that the claims were allowed over prior art

24   asserted by a sophisticated and motivated adversary against a number of related patents, there is an

25

26   _____
     [6]    In an IDS, the applicants submitted Motorola's interrogatory response, together with copies of
     the alleged prior art identified in that response, and then commented on that art in an amendment
27   filed the same day.  (Lynch Dec. Ex. 3 (August 20, 2009 IDS); Lynch Dec. Ex. 3 (August 20,
     2009 Amendment, at 20-23); *see also* "Other Publications" at 3 of the '964 patent.)   The
28   submitted prior art included photos showing devices from HP, Motorola, Nokia, Philips, NEC,
     AEG, Handspring, and others.  *See id*.

even greater likelihood that BlackBerry will prevail on any validity challenges Typo could possibly raise at trial.

Finally, secondary indicia of non-obviousness provide further evidence of the '964 patent's validity.  *See* Rempel Dec. ¶¶119-25.  In addition to Typo's copying of BlackBerry's patented design, noted above, the claimed inventions of the '964 patent have enjoyed commercial success in the form of sales of products that practice the claims.  *See* Douglas Dec. ¶13; Rempel Dec. ¶¶119-20.  Further, the claimed inventions of the '964 patent met a long-felt but unmet need— namely, the need for keyboard layouts optimized for thumb-typing on small, handheld devices. *See* Rempel Dec. ¶121.  The claimed inventions of the '964 patent have further gained industry acceptance, and have been recognized as the "iconic" design in handheld device keyboards.  *See id.* ¶122.  Finally, the claimed inventions have been the subject of praise by others: BlackBerry products that practice the '964 patent have received many industry awards, including awards specifically directed to the physical keyboard layout and structure.  *See id.* ¶¶123-25.[7]

## V.    A PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM

### A.    BlackBerry Will Be Irreparably Harmed if Typo is Allowed to Trade Off of BlackBerry's Goodwill and Erode BlackBerry's Customer Base

Courts have repeatedly found that "price erosion, damage to ongoing customer relationships, loss of customer goodwill (e.g., when an effort is later made to restore the original price), and loss of business opportunities" support a finding of irreparable harm in patent infringement cases.  *Celsis*, 664 F.3d at 932 (affirming district court's statement that "[t]here is no effective way to measure the loss of sales or potential growth—to ascertain the people who do not knock on the door or to identify the specific persons who do not reorder because of the existence of the infringer"); *see Abbot Labs. v. Sandoz, Inc*., 544 F.3d 1341, 1361-62 (Fed. Cir. 2008) ("loss of revenue, goodwill, and research and development support constitute irreparable harm."); *AstraZeneca LP v. Apotex Corp*., 633 F.3d 1042, 1063; (Fed. Cir. 2010)  "So long as there is a significant threat of harm, a preliminary injunction may issue regardless of the magnitude of the harm."  *QBAS*, 2010 WL 7785955 at *14.

---

[7] Quite a few of the articles announcing the Typo Keyboard praised the keyboard design precisely because of its facial similarity to the BlackBerry keyboard.  (Lynch Ex. 17,18,19,20,21, and 22.)

Harm to a patentee's goodwill does not require evidence of consumer confusion: "[e]ven absent consumer confusion … there can still be harm to a company's reputation, particularly its perception in the marketplace by customers, dealers, and distributors." *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d 1336, 1344-45 (Fed. Cir. 2013) (finding patentee's "reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products], particularly products considered less prestigious and innovative."). Here, however, consumer confusion already has been shown. *See* Lynch Dec. Ex. _, ¶_.

1. <u>BlackBerry Has Made Significant Investment in Developing Goodwill With Its Customers Relating to its Brand and Its Keyboard Design</u>

BlackBerry has long been recognized as a leader in the development of mobile handheld devices with physical keyboards. Starting in the late 1990s and continuing until today, BlackBerry's game-changing products have enabled consumers to interact with others on the go by sending and receiving email without being tethered to a modem or desktop computer. Douglas Dec. ¶¶3-8; *see also* Rempel Dec. ¶¶103-17. BlackBerry further released several of the earliest smartphones, and in the following years, was instrumental in developing the market through continued innovation in the design and development of devices that provided users with email and other text entry dependent applications. Douglas Dec. ¶¶3-7; Hofer Dec.¶¶5, 9-10. BlackBerry continued to place great emphasis and invest considerable resources into its distinctive and brand-identifying keyboard designs in this period. *See* Douglas Dec. ¶¶3-6; Hofer Dec. ¶¶5-6, 9, 14-16.

Over the years, millions of consumers have used BlackBerry devices to interact with others using text entry for e-mail and other services. Douglas Dec. ¶7.

*See id*. ¶13.

*Id*. ¶7-8, 11.

*See id*. ¶9.

BLACKBERRY LIMITED'S MOTION FOR A PRELIMINARY INJUNCTION

1 ████████████████████████████████ *Id.* ¶10. ████████████████

2 ████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████

4 ██████████████████████████ *Id.* ¶11.

5        2.        There Is No Way To Adequately Calculate The Loss Of Business
                  Opportunities And Goodwill Resulting From Typo's Infringement

        The accused Typo Keyboard product is a direct and intentional copy of the keyboard

design in BlackBerry's current flagship Q10 smartphone product, including the intrinsic design

elements that identify its products as uniquely "BlackBerry."  Thus, the harm that the accused

Typo Keyboard product presents is not merely a competing product with a physical keyboard that

steals BlackBerry's sales: it is a direct attack on BlackBerry by misappropriating BlackBerry's

innovations and brand identity embodied in its iconic keyboard, and combining it in an

unauthorized way with the iPhone's popularity, to undercut a central pillar of BlackBerry's value

proposition to BlackBerry customers.   Douglas Dec. ¶15; *see TruePosition Inc. v. Andrew Corp.*,

568 F.Supp.2d 500, 531 (D.Del. 2008) ("Plaintiffs are also frequently successful [in establishing

irreparable harm] when their patented technology is at the core of its business …."), *cited with

approval in Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1152 (Fed. Cir. 2011).

        First, due to the overwhelming similarity between the Typo Keyboard product and the

BlackBerry keyboard design (*see supra* Section II.B.), the Typo Keyboard product has caused and

will cause confusion for both current and potential BlackBerry's customers.  Typo's distribution

of a product that so openly copies BlackBerry's keyboard design will create the misimpression in

the marketplace that BlackBerry approves Typo's product.   Douglas Dec. ¶16, 24.

        Moreover, numerous reviews of the accused Typo Keyboard product note that, due to its

top-heavy design, and cramped keys that are "loud" and "plasticky," it fails to meet the high

standard of quality that consumers have come to expect from BlackBerry's keyboard products.

Indeed, these reviews note that "the Typo isn't a good keyboard," that it "feels like a cheap

knockoff of a BlackBerry keyboard, is "maddening", and "leads to a dramatic increase in typos."

*See supra* Section II.B. The distribution of such an inferior product with the unique design cues

1  intrinsic to BlackBerry will indelibly harm BlackBerry's goodwill with its customers.   Douglas

2  Dec. ¶22, 26; *see, e.g.*, *Clamp Swing Pricing Co.* v. *Super Market Merchandising and Supply, Inc.*

3  Case No. 13-CV-04515, 2013 WL 6199155 (N.D. Cal. Nov. 21, 2013).   Further, if Typo's

4  conduct is not stopped, it will lead to further "knockoff" products that trade off of BlackBerry's

5  goodwill and exacerbate the harm to BlackBerry.   Douglas Dec. ¶24.

6       Next, Typo's business model is predicated on persuading those who prefer BlackBerry to

7  forgo buying a BlackBerry in favor of an add-on keyboard for the iPhone.   *See supra* Section

8  II.B.; Douglas Dec. ¶¶17-19.   Typo's "solution" is to replace the use of BlackBerry by its

9  customers with an Apple iPhone product used with the accused Typo Keyboard product, using

10  BlackBerry's own intellectual property to harm BlackBerry.   Douglas Dec. ¶22.   At least one

11  article has noted that Typo is "looking to kill off the [BlackBerry] smartphone brand all together

12  [with] a BlackBerry-styled keyboard case that attaches to your iPhone …."   Lucente Dec. ¶66.

13       If Typo is not prevented from copying BlackBerry's design and trading off of its unique

14  brand image, it will have an irreparable impact to BlackBerry's business.   ██████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████.

20  Douglas Dec. ¶25; *see Celsis*, 664 F.3d at 932 (finding loss of business opportunities and damage

21  to customer relationships to be irreparable harm); *Alacritech, Inc. v. Microsoft Corp.*, Case No.

22  04-03284, 2005 WL 850729 at *7 (N.D. Cal. Apr. 12, 2005)(finding competition from larger

23  hardware vendor enabled by infringement as evidence of irreparable harm).

24       Critically, each sale of a competing Typo product will not simply result in a 1:1 loss of

25  profit for BlackBerry, but also will have an incalculable impact on BlackBerry's customer base.

26  Once a consumer either adopts or transitions to a competing device, such as the iPhone, there are a

27  number of impediments to reclaiming that customer in the future.   Douglas Dec. ¶28.

28  ████████████████████████████████████████████████

1 ██████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████

6 ██████████████████████████████████████████████████████

7 ██████████████████████████████████████████████████████

8 ██████████████████████████████████████████████████████

9 █████████████████████████   Douglas Dec. ¶29.

Second, costs of smartphone devices themselves are often subsidized by wireless carriers, such that the consumers are able to purchase the phone at a discount when entering a service contract. These discounts are often a significant percentage of the price of the phone, and can exceed several hundred dollars. In exchange, the consumer agrees to a fixed term service contract with that wireless carrier, which typically lasts for two years. If the consumer were to attempt to buy a new smartphone during the two year term, that consumer would no longer be able to purchase the device at a subsidized price, but would typically have to pay the full manufacturer's suggested retail price ("MSRP") for the product.[8] Alternatively, the consumer could elect to terminate their contract; however, such service contracts almost always include termination fees, which again can amount to several hundred dollars depending upon the remaining period of the contract at the time of termination. As a result, once a current or potential BlackBerry customer is convinced to purchase a competing product, such as the iPhone, there is typically at least a two year window during which the customer has essentially been "lost." Douglas Dec. ¶¶30- 35.

Finally, during that period of time, the lost customer will invest time and resources in the environment of the competing device (referred to as the "ecosystem" for that device), including the download and use of applications for that device. Once a customer makes an investment in a

---

[8]   For example, Verizon Wireless ("Verizon") is a distributor of BlackBerry's Q10. Currently, if a consumer agrees to a 2 year service contract with Verizon, they can purchase a BlackBerry Q10 for $199.99. By contrast, if the consumer attempts to buy the Q10 from Verizon without a 2 year contract (e.g., selecting a month to month contract), the consumer is required to pay the full MSRP for the product, which is $549.99 (more than three times the price). Douglas Dec. Ex. 7; ¶¶33-34.

1  particular competing ecosystem, such as Apple's, it becomes all the more difficult to get the

2  customer to transition to another ecosystem.   Douglas Dec. ¶37.

3  ████████████████████████████████████████████████

4  ████████████████████████████████████████████████

5  ██████████████████████████████████████. *Id*. ██████████

6  ████████████████████████████████████████████████

7  Douglas Dec. ¶¶31-37; *see Celsis*, 664 F.3d at 932 (finding that, where the market is "particularly

8  sensitive" due to customer purchasing habits, "the loss of a single sale in this market may be more

9  harmful that for products purchased daily."); *Broadcom Corp. v. Qualcomm Inc*., 543 F.3d 683,

10  702 (Fed. Cir. 2008)(finding that where "[t]he market for [the devices at issue] is unlike the

11  market for typical consumer goods where competitors compete for each consumer sale, and the

12  competition is instantaneous and on-going," this supports a finding of irreparable injury.)[9]

13  **VI.   THE BALANCE OF EQUITIES FAVORS BLACKBERRY**

14         The balance of hardships tipping in favor of a plaintiff is not a "prerequisite to awarding

15  preliminary injunctive relief."  *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed.Cir.

16  1988).   The Court needs only to consider the balance, and it may grant preliminary relief even if

17  "neither part has a clear advantage."  *Id*. at 1458.   In this case, the substantial and irreparable

18  harm that BlackBerry will suffer without injunctive relief far outweighs any potential harm to

19  Typo.   Typo elected to build its business around deliberately copying BlackBerry's iconic

20  keyboard design in support of Typo's efforts to supplant BlackBerry within its customer base.

21  *See* Section II.B., *supra*.   Simply because Typo might have to expend resources to come up with

22  its own keyboard design does not weigh against entry of an injunction; rather, it is a problem of

23  Typo's own making: "one who elects to build a business on a product found to infringe cannot be

24  heard to complain if an injunction against a continuing infringement destroys the business so

25  elected."   *Id.; Robert Bosch*, 659 F.3d at 1156.

26  ─────────────────────
   [9]   Finally, given that the '964 patent grant has only three and a half years remaining, "[d]elaying
27  an injunction until the litigation is concluded would irreparably harm [patentee] by depriving
   [patentee] part of its patent grant.  *Elantech Devices Corp. v. Synaptics, Inc.*, 2008 WL 1734748
28  at *10 (N.D. Cal. Apr. 14, 2008)(finding likely duration of litigation and fact that patent had "less
   than half of its term remaining" as evidence of irreparable harm).

1    Moreover, given Typo has not begun official delivery of product to its customers, it would

2    be less prejudicial to enter an injunction now as opposed to waiting until it has invested more

3    resources in its current product, and then later enjoin its use.  *See Trak, Inc. v. Benner Ski KG*,

4    475 F. Supp. 1076, 1078 (D. Mass. 1979) (holding that enjoining defendant at commencement of

5    sales campaign would "nip[] the operation in the bud" whereas denial of preliminary relief would

6    result in defendant's entrenchment, "making permanent relief more problematical").

7    **VII.    A PRELIMINARY INJUNCTION SERVES THE PUBLIC INTEREST**

8    In patent cases, it has been long recognized that "[i]ntellectual property rights are a means

9    of encouraging experimentation and creation.  Although there are limits to the benefits of strong

10   intellectual property rights, the assurance that inventions are protected from likely infringers

11   allows researchers to spend resources and innovate, confident that they will be able to reap the

12   benefits of their work."  *E.g., QBAS*, 2010 WL 7785955 at *14 (finding public interest weighed in

13   favor of granting preliminary injunction based upon "the importance of protecting intellectual

14   property rights."); *see Celsis*, 664 F.3d 922 at 931 ("The public interest favors the enforcement of

15   [patentee's] patents rights here.  Such investment in … research and development must be

16   encouraged and protected by the exclusionary rights conveyed in valid patents." (citations

17   omitted)).  Moreover, where the "injunction concerning the sale of Defendants' product would be

18   narrow and have a limited impact on non-parties, the public interest in intellectual property

19   protection outweighs any minimal damage caused by precluding access to Defendants' product."

20   *See QBAS,* 2010 WL 778955 at *14.  Because BlackBerry has demonstrated a likelihood of

21   success on its infringement claims, the public interest would be served by prohibiting Typo from

22   infringing BlackBerry's patents.  *See Abbot Labs*, 544 F.3d at 1362 ("To the extent that this Court

23   has found a substantial likelihood that the [patent in suit] is valid and enforceable, there can be no

24   serious argument that public interest is not best served by enforcing it").

25   **VIII.   CONCLUSION**

26   For the foregoing reasons, BlackBerry respectfully requests that the Court grant

27   BlackBerry's Motion for a Preliminary Injunction.

28

BLACKBERRY LIMITED'S MOTION FOR A PRELIMINARY INJUNCTION

1    DATED:   January 22, 2014              QUINN EMANUEL URQUHART &
2                                            SULLIVAN, LLP

3                                            By  /s/ Kevin P.B. Johnson
4                                               Kevin P. B. Johnson
                                                Attorney for BlackBerry Limited
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28