1    OLIVIER A. TAILLIEU (SBN 206546)
     *o@taillieulaw.com*
2    RAFFI V. ZEROUNIAN (SBN 236388)
     *rz@taillieulaw.com*
3    **THE TAILLIEU LAW FIRM LLP**
     450 N. Roxbury Drive, Suite 700
4    Beverly Hills, CA 90210
     Telephone: (310) 651-2440
5    Facsimile: (310) 651-2439

6    Attorneys for Defendant TYPO PRODUCTS LLC

7

8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10                       **SAN FRANCISCO DIVISION**

11

12   BLACKBERRY LIMITED, a Canadian          CASE NO. 3:14-cv-00023 WHO
     corporation,
13                                           **MEMORANDUM OF POINTS AND**
                    Plaintiff,               **AUTHORITIES IN SUPPORT OF TYPO**
14                                           **PRODUCTS LLC'S OPPOSITION TO**
                    v.                       **BLACKBERRY'S MOTION FOR A**
15                                           **PRELIMINARY INJUNCTION**
     TYPO PRODUCTS LLC, a Nevada limited liability
16   company,                                *[Filed concurrently with Declaration of Charles*
                                             *M. Curley; Declaration of Jacob O. Wobbrock,*
17                  Defendant.               *Ph.D.; Declaration of Laurence Hallier; and*
                                             *Declaration of Olivier A. Taillieu]*
18
                                             Date:      March 19, 2014
19                                           Time:      2:00 p.m.
                                             Place:     San Francisco Courthouse
20                                                      450 Golden Gate Avenue, Courtroom 2
                                                        San Francisco, CA 94102
21                                           Judge:     Honorable William H. Orrick

22

23

24

25

26

27

28
     0167-1001
     MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR
                              PRELIMINARY INJUNCTION

## **TABLE OF CONTENTS**

I.     INTRODUCTION .................................................................................................1

II.    BACKGROUND ..................................................................................................1

III.   A PRELIMINARY INJUNCTION IS AN EXTREME REMEDY....................................1

IV.    BLACKBERRY IS UNLIKELY TO SUCCEED ON ITS INFRINGEMENT
       CLAIMS ...........................................................................................................3

A.     The Asserted Claims of the '964 Patent Are Invalid .........................................3

       1.    The Asserted Claims of the '964 Patent Are Rendered Obvious by the Prior
             Art ..............................................................................................................3

       2.    The Asserted Claims of the '964 Patent are Invalid for Failing to Satisfy the
             Written Description Requirement of 35 U.S.C. § 112...............................7

       3.    The Asserted Claims of the '964 Patent are Not Entitled to a 1998 Priority
             Date..............................................................................................................9

       4.    The Asserted Claims of the '964 Patent are Invalid as Indefinite Under 35
             U.S.C. § 112 ¶2 ..........................................................................................10

B.     The Typo Keyboard Does Not Infringe The '964 Patent ...................................11

       1.    The '964 Patent Requires Construction of Two Key Claim Terms.......................12

       2.    BlackBerry Will not Prove at Trial that the Typo Keyboard Infringes the
             '964 Patent ..................................................................................................15

C.     The D'775 Patent is Invalid ..............................................................................17

D.     The Typo Keyboard Does Not Infringe the D'775 Patent ..................................19

       1.    The Prior Art Sets the Scope of the D'775 Patent ........................................19

       2.    All Functional Elements Must Be Ignored .................................................20

       3.    The D'775 Patent is not Infringed Because the Typo Keyboard Is Not
             Substantially The Same ...............................................................................21

E.     BlackBerry's Patent Infringement Claims are Barred by Equitable Estoppel......................22

V.     BLACKBERRY SUFFERS NO IRREPARABLE HARM...............................................23

VI.    THE BALANCE OF THE HARMS WEIGHS STRONGLY AGAINST AN
       INJUNCTION....................................................................................................25

VII.   THE PUBLIC GOOD WILL BE HARMED IF TYPO IS ENJOINED..............................26

       CONCLUSION..................................................................................................26

## TABLE OF AUTHORITIES

### Cases

*Mylan Labs., Inc. v. Leavitt*, 484 F. Supp. 2d 109, 123 (D.D.C. 2007) ..........................................29

*Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1188 (Fed. Cir. 1988) ............................................25

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1043 (Fed. Cir. 1992). ...........28

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed. Cir. 1995)...............27

*Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1328 (Fed. Cir. 2006)....................................33

*Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267 1272–73 (Fed. Cir. 1990). .................27

*AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1248 (Fed. Cir. 2001).................................16

*Altana Pharma AG v. Teva Pharm, USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009). ...................3

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001). ...............3

*Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1335 (Fed. Cir. 2010)............................9

*Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003) ..........................................2

*Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012)....................................29

*Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) ...........................9, 10

*Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990). ...................29

*Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009)....................29

*Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998)....................................................15

*Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1378 (Fed. Cir. 2004).........21

*Broomall Industries v. Data Design Logic Systems*, 786 F.2d 401, 406 (Fed. Cir. 1986)............28

*Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008)........7

*Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1379 (Fed. Cir. 2005).................................................12

*Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) ......................................14

*Dart Industries, Inc. v. Banner*, 636 F.2d 684, 688 (D.C.Cir.1980)...............................................11

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).......................13

*Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665 (Fed. Cir. 2008) ...........................................21

*EIT Holdings, LLC v. Yelp! Inc.*, C 10-05623 WHA, 2012 WL 174803 (N.D. Cal. Jan. 20, 2012)..............16

MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR
PRELIMINARY INJUNCTION

*Electromotive Div. of Gen. Motors Corp. v. Transp. Sys. Div. of Gen. Elec. Co.*, 275 F. Supp. 2d 850, 862 (E.D. Mich. 2003) ......................................................................................................................27

*Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1356 (Fed. Cir. 2008)..............................................2

*Gardner v. Toyota Motor Corp.*, C 08-0632 RAJ, 2009 WL 4110305, at *6 (W.D. Wash. Nov. 19, 2009) 13

*Gorham Co. v. White, 81 U.S. 511, 528 (1871)* ...................................................................................26

*Graham Webb Int'l v. Helen Curtis Inc.*, 17 F. Supp. 2d 919, 931 (D. Minn. 1998)..........................33

*H. Jay Spiegel & Assocs., P.C. v. Spiegel.*, 652 F. Supp. 2d 630, 636 (E.D. Va. 2008)......................32

*Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd.*, 1996 ..........................................................1

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003) ........................13

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990)..............................32

*In re NTP, Inc.*, 654 F.3d 1268, 1277 (Fed. Cir. 2011)..................................................................11, 12

*Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233, 1239 (Fed. Cir. 2009). ................21

*Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ....................................................15

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ......................................................................7

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) ...............................14

*Medi–Flex, Inc. v. Nice–Pak Products, Inc.*, 422 F. Supp. 2d 1242 (D. Kan. 2006)..........................33

*Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1476 (Fed. Cir. 1998) ........................15

*Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1346 (Fed. Cir. 2013)...........10

*Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003).........................................14

*Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1326-28 (Fed. Cir. 2007) .........16

*Peters v. Active Mfg. Co.*, 129 U.S. 530, 537 (1889)..........................................................................21

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005)...........................................................17

*Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996). ..................................31

*Ranbaxy Pharm. Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239-40 (Fed. Cir. 2003)................................2

*Richardson v. Stanley Works, Inc.*, 597 F. 3d 1288, 1293-94 (Fed. Cir. 2010) .................................24

*Saffran v. Johnson & Johnson*, 712 F.3d 549, 558-61 (Fed. Cir. 2013) ............................................15

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 2008 WL 114361, at *6 (D. Del. Jan. 8, 2008)......................................................................................................................29

*Skyhook Wireless, Inc. v. Google, Inc.*, CIV.A. 10-11571-RWZ, 2012 WL 4076180 (D. Mass. Sept. 14, 2012) ........................................................................................................................................16

*Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573 ....................................................................2

*Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009). ...................3

*Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991)..........................................9

*Wing Shing Products (BVI) Co. Ltd. v. Sunbeam Products, Inc.*, 665 F. Supp. 2d 357, 361 (S.D.N.Y. 2009)23

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ..................................................1

<u>Other Authorities</u>

35 U.S.C. § 102..............................................................................................................................17

35 U.S.C. § 103................................................................................................................................3

35 U.S.C. § 112.....................................................................................................................2, 3, 7, 9

35 U.S.C. § 120................................................................................................................................9

MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR PRELIMINARY INJUNCTION

## I.    INTRODUCTION

BlackBerry seeks a monopoly on keyboards for any device. Regretfully, however, small keyboards with nearly identical layouts as the one "claimed" by BlackBerry have been around since the mid-1980s. In fact, prior art conveniently omitted by BlackBerry in its prosecution of the 7,629,964 Patent ("the '964 patent") clearly defeats any claim BlackBerry may have against Typo Products LLC ("Typo"). As such, BlackBerry cannot prevail on the '964 patent or establish design patent infringement. No one looking to buy a BlackBerry phone, because of an alleged "resemblance," would buy a case with a physical keyboard instead. Typo keyboards are sold on Typo's website, cost $99.00, and are for people who already own an iPhone. BlackBerry phones are sold on its own website, cost $549.00, and require activation from a cell phone carrier. No consumer will be confused. Lastly, BlackBerry's claim of irreparable harm does not withstand scrutiny. Typo has delivered approximately 4,000 iPhone cases to date and has no ability to produce more than 10,000 cases per month. In contrast, BlackBerry sells millions of phones per month.

## II.    BACKGROUND

Typo is a start-up company that has invested over $1.4 million in the development of an iPhone accessory consisting of a protective case with a physical keyboard. Hallier Decl. ¶ 6. Typo's sole product is a clever innovation that allows iPhone users to type text through the use of a physical keyboard instead of Apple's touch keyboard. Hallier Decl. ¶ 7. Many other similar products are currently on the market, but for some reason, BlackBerry has decided to flex its muscle against Typo. Hallier Decl. ¶¶ 13-19, 21-26 & Hallier Decl. Exs. 1-12. This decision may be due to the publicity that BlackBerry hoped to receive due to this filing. After all, BlackBerry is a company that desperately needs to change the narrative. In a recent article, BlackBerry handsets were proclaimed "extinct" with a report showing a dwindling market share worldwide. Hallier Decl. ¶ 49. Yet, in spite of this catastrophic fall, BlackBerry chooses to blame Typo for its demise and asks this Court for a preliminary injunction.

## III.    A PRELIMINARY INJUNCTION IS AN EXTREME REMEDY

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

"Courts have 'developed a reluctance to resort to preliminary injunctions in patent infringement cases, and have constructed a rather strict standard for the granting of this form of equitable relief.'" *See Heidelberg Harris, Inc. v. Mitsubishi Heavy Indus., Ltd.*, 1996 WL 189398, at *3 (N.D. Ill. Jan. 9, 1996) (quoting *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1578 (Fed. Cir. 1983)).

To obtain this drastic remedy, BlackBerry bears the heavy burden of proving that: (1) it is likely to succeed on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs the damage to the opposing party; and (4) the injunction is in the public interest. See *Winter*, 555 U.S. at 20; *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003). BlackBerry fails to establish these required elements.

## IV. BLACKBERRY IS UNLIKELY TO SUCCEED ON ITS INFRINGEMENT CLAIMS

To establish a likelihood of success on the merits, BlackBerry "must show, in light of the burdens that will inhere at trial, that (1) it will likely prove infringement and (2) any challenges to the validity and enforceability of its patent 'lack substantial merit.'" *See Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003). Courts are required to analyze the claim constructions under which the accused products allegedly infringe. *See, e.g., Ranbaxy Pharm. Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1239-40 (Fed. Cir. 2003).

A defendant need not "prove" invalidity at the preliminary injunction stage, but only must "put forth a substantial question of invalidity to show that the claims at issue are vulnerable." *See Erico Int'l Corp. v. Vutec Corp.*, 516 F.3d 1350, 1356 (Fed. Cir. 2008). The patent holder has the "ultimate burden of establishing a likelihood of success on the merits with respect to the patent's validity." *Altana Pharma AG v. Teva Pharm, USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009). At the preliminary injunction stage, the defendant does not face the "clear and convincing" evidence burden reserved for trials. *Id.* at 1006. Instead, "vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial." *Id.* (quoting *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001)).

Here, a preliminary injunction is improper if Typo merely shows a "substantial question of invalidity." *Altana Pharma AG*, 566 F.3d at 1006. Once Typo demonstrates that BlackBerry's patents are potentially invalid, BlackBerry must show contrary evidence and persuade the Court that, "despite the challenge presented

to validity, [BlackBerry] nevertheless is likely to succeed at trial on the validity issue." *Titan Tire Corp. v. Case New Holland, Inc.*, 566 F.3d 1372, 1377 (Fed. Cir. 2009).

BlackBerry's motion fails to establish a likelihood of success on the merits. The asserted claims of the '964 and D'775 patents are invalid over the prior art, and the asserted claims of the '964 patent are additionally invalid for failing to satisfy the written description requirement of 35 U.S.C. § 112 ¶ 1 and as indefinite under 35 U.S.C. § 112 ¶ 2. The asserted claims of the '964 and D'775 patents are also not infringed by the Typo keyboard. Moreover, BlackBerry's patent claims are barred by the defense of equitable estoppel.

### A. The Asserted Claims of the '964 Patent Are Invalid

The asserted claims of the '964 patent are invalid as (1) obvious under 35 U.S.C. § 103, (2) as failing to meet the written description requirement of 35 U.S.C. § 112 ¶ 1, and (3) as indefinite under 35 U.S.C. § 112 ¶ 2. Although Typo has had less than two weeks for analysis, it is readily apparent that the asserted claims are invalidated by several pieces of prior art that BlackBerry never disclosed to the Patent Office. Typo has established a substantial question as to the validity of the asserted claims, and BlackBerry is unlikely to prevail under the '964 patent.

### 1. The Asserted Claims of the '964 Patent Are Rendered Obvious by the Prior Art

The asserted claims of the '964 patent are rendered obvious under 35 USC § 103 by a variety of prior art, such as the combination of U.S. Patent No. 6,049,796 to Siitonen (Siitonen) or any other QWERTY keyboard setup and any of a variety of Smith Corona products manufactured in the late 1980s such as the Spell Mate or the Spell Right. Curley Decl. ¶¶ 16, 45, 49-50. Strangely, BlackBerry never disclosed any of these Smith Corona products to the Patent Office during the prosecution of the '964 patent.

The QWERTY keyboard has been around since the 1870s and has been present in many messaging devices. Curley Decl. ¶¶ 22, 39. Early typewriters incorporated this keyboard and many other elements of




Figure 11

claim 19. Curley Decl. ¶ 39. For instance, a 1937 Corona typewriter (shown below) contains most of the limitations of claim 19.[1]

During the mid-1980s Smith Corona began to focus on handheld mobile electronic devices. One of their first product developments was the "TelAssistant Companion" (Fig. 11). Curley Decl. ¶ 30. This was a mobile handheld electronic device that held all sorts of information such as phone numbers, notes, reports and other personal information. Curley Decl. ¶ 30. These types of devices later became generically known as PDA's (personal digital assistants). Curley Decl. ¶ 30. It was around this time that the phenomenon of "thumb-typing" became relevant—and not, as BlackBerry would argue, because of anything BlackBerry did. Curley Decl. ¶¶ 31-36. Prompted by studies that indicated a preference for a keyboard made up of perfectly aligned rows and columns, Smith Corona altered its designs and released the Spell Mate 30 in 1988. Curley Decl. ¶ 35. (see below)



Figure 12



FIG 13

This product was slightly smaller than earlier mobile devices and had a flip-open case, with a display built into the lid. Curley Decl. ¶ 35. A design patent for this device, called "Pocket Electronic Dictionary" was ultimately granted in 1991 (U.S. Patent No. D319,223). Curley Decl. ¶ 35. The design is distinguished by the vertical and horizontal alignment of its keybuttons. Curley Decl. ¶ 35.

_____

[1]This typewriter has a keyboard configured in a housing; the keyboard has 26 letters and at least another key; the twenty six letters and another key are arranged in three rows; and the letters in the top row are distributed across the top surface. Curley Decl. ¶ 39. A letter key in the middle row is not adjacent to the left edge, but the keyboard complies with the 5/5-5/4-4/3 configuration and the requirement that the keys in the third row be "substantially aligned" with the top two rows. Curley Decl. ¶ 39.

1   Smith Corona also produced a series of less expensive low-end versions of this design that lacked the

2   flip top cover—namely the Smith Corona Spell Right 200. Curley Decl. ¶ 36. (see below)

3

4   

5

6   

7

8   The Spell Right 200 was manufactured in 1988 and a design patent (U.S. Patent No. D310,209) was later

9   granted for this this device in 1990. Curley Decl. ¶ 36. It is again distinguished by the vertical and horizontal

10  alignment of its keybuttons. Curley Decl. ¶ 36. (see above) The Spell Right and the Spell Mate both meet all of

11  the elements of claim 19—save for the 4/3 configuration in the lowest row. Curley Decl. ¶ 40. Such a

12  configuration was well known in the art at the time, however, as evidenced by every iteration of the traditional

13  QWERTY set up. Curley Decl. ¶ 40. By the late 1980s, it would have been obvious for a person of ordinary

14  skill in the art to combine the Spell Right or the Spell Mate with a traditional QWERTY device having a 4/3

15  configuration in the lowest row (such as the TelAssistant) in order to achieve each and every element of claim

16  19. Curley Decl. ¶ 41. There was no mention of either the TelAssistant, the Spell Right, or the Spell Mate in

17  the prosecution history of the '964 and it is highly likely that had BlackBerry done so, claim 19 would not have

18  been allowed.

19  The examiner initially rejected claim 19 in light of Siitonen (see below). Hofer Decl., Ex. 3 (Office

20  Action mailed February 20, 2009, at pp. 2-5). In analyzing Siitonen, the examiner found that it taught (1)

21  twenty six letter keys with an extra key; (2) an upper row containing 10 letter keys; (3) a middle row

22  containing 9 letter keys; (4) a lower row containing 7 letter keys;                                      (5)

23  the letter keys in the top row being distributed from left to right;                                     (6)

24  each key in the lower row being in substantial alignment with a

25  letter in the middle row; and (7) a 5/5 configuration on the top row.                                    In

26  response to that office action, BlackBerry argued that the '964

27  patent was not anticipated because Siitonen:

28

"(1) fails to disclose a top row in which the letter keys extend edge to edge, or a middle row in which the keys also extend edge to edge with a letter key adjacent to the left of the left edge; (2) fails to disclose keys in each of the rows that are arranged so that approximately half of the keys in the respective rows are positioned to the left of the vertical reference and half of the keys are positioned to the right of the vertical reference; (3) fails to disclose a top row with five letter keys on each side of the vertical reference, a middle row with five letter keys on the left and four letter leys on the right, and a lower row with four letter keys on the left and three letter keys on the right; and (4) fails to disclose each key in the lower row to be substantially vertically aligned with a respective key in each of the upper and middle row."

Hofer Decl. Ex. 3 (Amendment filed on August 20, 2009, page 16). The Spell Mate discloses all of these restrictions, however, save for the 4/3 configuration on the third row, which was already disclosed in the Siitonen reference. Curley Decl. ¶ 44. The examiner would have rejected claim 19 entirely had he been made aware of the Spell Mate as prior art. Indeed, the subject matter of claim 19 is "the product not of innovation but of ordinary skill and *common sense*," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) (emphasis in original), and is thus obvious under § 103. Curley Decl. ¶¶ 45-46.

The asserted dependent claims 20 and 24 are also obvious under § 103. Claim 20 claims "[t]he keyboard of claim 19 wherein each of the upper and middle rows has the same total number of keys." Claim 24 claims "[t]he keyboard of claim 19 in which at least two of the rows have the same number of total keys." These limitations are present in numerous prior art products with QWERTY keyboards including the Spell Mate and the Spell Right. Curley Decl. ¶¶ 49, 50. These dependent claims, too, are invalid. Curley Decl. ¶¶ 49, 50.

BlackBerry's sole argument of non-obviousness completely ignores the prior art. Rather, it relies only on purported secondary considerations of non-obviousness. BlackBerry has argued that the patent has withstood scrutiny from Motorola, that it has achieved commercial success, and that it has filled a long-felt need and been praised by others. See Opening Brief, p.19. Although BlackBerry argues that the '964 patent survived litigation against Motorola, the '964 patent was not at issue in that action. Moreover a detailed study of the patents in the Motorola action indicates that none of subject matter BlackBerry asserted in the Motorola action relate to the essence of claim 19, i.e., spatial distribution of keys on a keyboard as recited in claim 19. Taillieu Decl. Ex. 6. Thus, prior art that may have been identified during the Motorola action not pertain to the

claims asserted here. Accordingly, because of the markedly different claim scope between the claims of the patents in the Motorola action and claim 19 of the '964 patent, the assertion that the '964 patent is valid because of the Motorola action is overreaching and of little relevance.

BlackBerry also argues that its messaging device has received commercial success and praise by others. But the "commercial success" and "praise by others" that BlackBerry achieved is not over the RIM 850/950 Wireless Handheld device related to the '964 patent. Such "success" is over its line of BlackBerry phones—namely the Bold line of phones. Douglas Decl. ¶ 13. As to the RIM 850/950 device, BlackBerry provides no sales information to allow this Court to make that determination. Certainly, the messaging device pictured in the '964 patent is far from iconic. Hallier Decl. ¶ 27.

No one in the industry pays any mind to the '964 patent when designing keyboards for cell phones. At least 40 devices on the market over the past eight years have used the exact same configuration "claimed" by BlackBerry in this patent. Hallier Decl. ¶¶ 13-19, 21-26 & Hallier Decl. Exs. 1-12. The Hallier Declaration demonstrates that the particular key configuration of claim 19, as that claim has been interpreted by BlackBerry, is universal across manufacturers. Hallier Decl. ¶¶ 13-19, 21-26 & Hallier Decl. Exs. 1-12. Industry behavior provides no indicia of the validity of the '964 patent as dozens of devices freely incorporate all of the elements of claim 19 with impunity. These purported secondary considerations are therefore irrelevant and not probative of obviousness, and the Court should find that the asserted claims of the '964 patent are invalid on obviousness grounds.

## 2. The Asserted Claims of the '964 Patent are Invalid for Failing to Satisfy the Written Description Requirement of 35 U.S.C. § 112

The written description requirement, as set forth in the first paragraph of 35 U.S.C. § 112, provides, in part, that the application "shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same." 35 U.S.C. § 112 ¶ 1. To satisfy the written description requirement, "the applicant must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and

demonstrate that by disclosure in the specification of the patent." *Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (quoting *Vas–Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563–64 (Fed. Cir. 1991)). Accordingly, claims added during prosecution must find support sufficient to satisfy § 112 in the written description of the original priority application. *See, e.g., Anascape, Ltd. v. Nintendo of Am., Inc.*, 601 F.3d 1333, 1335 (Fed. Cir. 2010). Assessing "possession as shown in the disclosure" requires "an objective inquiry into the four corners of the specification." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010).

Here, the specification of the '964 patent does not meet the written description requirement with respect to the subject matter claimed in claim 19 of the '964 patent. For instance, the specification makes no mention of a "device housing . . . being bisected by a vertical reference substantially midway between the left edge and the right edge." '964 Patent, Claim 19. To wit, the specification does not once refer to a vertical reference or its relevance to the invention. Nor does the specification reference key distribution, key placement, or key alignment. In fact, the specification is completely silent as to the key placement and provides no insight as to why such a placement is either novel or innovative.

The prosecution history of the '964 patent reveals that claim 19 was added during prosecution and does not find support in the specification. Following two Office Actions, BlackBerry submitted an Amendment adding additional claims including the asserted claims 19, 20 and 24. (Amendment dated 1/15/09)[2] This Amendment is the first time anything related to "device housing ... being bisected ... by a vertical reference" was ever mentioned during the entire prosecution of the '964 patent. Similarly, this is the first time that a specific letter key configuration is discussed. The asserted claims were further redrafted and eventually issued, but the specification was never modified to provide written description support for these claims. (See Amendment dated 8/20/09)

In sum, the subject matter of claim 19 came out of left field midway through the prosecution, and the written description support for this claim is nowhere to be found in the specification of the '964 patent. Courts

---

[2]   The asserted claims 19, 20 and 24 were prosecuted as claims 23, 24 and 29 during the prosecution.

will not hesitate to invalidate a claim for failing to satisfy the written description requirement in this situation. See, e.g., *Novozymes A/S v. DuPont Nutrition Biosciences APS*, 723 F.3d 1336, 1346 (Fed. Cir. 2013) (affirming invalidity of claims, under the written description requirement, because "nothing in the [original patent] application indicates that [the patentee] then possessed what it now claims"). The '964 patent's written description simply does not "'allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed'" in claim 19. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (alteration in original) (quoting *Vas–Cath*, 935 F.2d at 1563). Claim 19, and the asserted dependent claims 20 and 24, are therefore invalid under section 112, paragraph 1.

BlackBerry may point to Figure 3 in response to this argument and claim that the drawing indicates a center point near the center of the keyboard. But, claim 19 recites that the vertical reference line bisects a top surface of a "device housing" and is substantially midway between a left edge and a right of the top surface of the device housing. FIG. 3 of the '964 patent illustrates a center point of the keyboard (reference number 950). However, the relationship between the position of the keyboard and the device housing is never discussed in the specification. Therefore, even if the specification provides support for how elements are positioned relative to the center of the keyboard, there is no discussion or support for how elements are positioned relative to the edges of the device housing. Accordingly, the claim limitations related to the surface of the device housing are not supported by the specification, and claim 19 fails to satisfy the written description requirement.

### 3.    The Asserted Claims of the '964 Patent are Not Entitled to a 1998 Priority Date

Independently, yet for the very same reasons that the asserted claims of the '964 patent are invalid for failure to satisfy the written description requirement of 35 U.S.C. § 112, paragraph 1 (see Part IV.A.2, supra), the asserted claims are not entitled to the benefit of an earlier (e.g., 1998) priority date. A claim is entitled to the priority date of an earlier-filed parent application only if the earlier-filed application itself complies with the written description requirement of 35 U.S.C. § 112 ¶ 1. 35 U.S.C. § 120 ("An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States . . . shall have the same effect, as to such invention, as though filed on the date of the prior application."). Moreover, "[i]f a later filed application claims priority through the heredity of a

chain of applications, each application in the chain must satisfy § 112." *In re NTP, Inc.*, 654 F.3d 1268, 1277

(Fed. Cir. 2011); *see also Dart Industries, Inc. v. Banner*, 636 F.2d 684, 688 (D.C.Cir.1980).

Given these principles, BlackBerry cannot attempt to argue that the asserted claims *of the* '964 patent

are entitled to an earlier priority date. The specification of the '964 patent and the specifications of each of the

'964 patent's parent applications contain substantially the same disclosures.[3] As discussed in Part IV.B.2,

*supra*, the specification of the '964 patent does not satisfy the written description requirement with respect to

the "bisected by a vertical reference" and the letter key configuration elements of the asserted claims. Because

the specifications of each of these parent applications contain nearly the same disclosures as that of the '964

patent specification, these parent specifications also do not satisfy the written description requirement as to the

asserted claims. *In re NTP, Inc.*, 654 F.3d at 1277. The asserted claims are accordingly not entitled to a priority

date based on these parent applications. *Id.*[4]

### 4.   The Asserted Claims of the '964 Patent are Invalid as Indefinite Under 35 U.S.C. § 112 ¶2

A patent must "conclude with one or more claims particularly pointing out and distinctly claiming the

subject matter which the applicant regards as his invention." 35 U.S.C. § 112 ¶ 2. Because the claims perform

the fundamental function of delineating the scope of the invention, *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371,

1379 (Fed. Cir. 2005), the purpose of the definiteness requirement is to ensure that the claims delineate the

scope of the invention using language that adequately notifies the public of the patentee's right to exclude,

---

[3]   The face of the '964 patent lists parent applications U.S. Patent Application Nos. 10/425,121,
10/634,774, 09/106,585, and 29/089,942. Taillieu Decl. Ex. 1-4 ('964 Patent at 1:5-19) The ultimate parent
application, Application No. 29/089,942, filed on June 26, 1998, is for a design patent and consists entirely
of drawings. (Taillieu Decl. Ex. 4) Application No. 09/106,585, filed three days later on June 29, 1998 as a
continuation-in-part of that design patent application, contains a specification that is substantially the same as
the specification filed with the application for the '964 patent. (Taillieu Dec. Ex. 3) The two subsequent
continuation applications, Nos. 10/634,774 and 10/425,121, also contain a specification that is substantially
the same as that of the '964 patent application. (Taillieu Decl. Exs. 1-2)

[4]   Although BlackBerry does not contend in its brief that the asserted claims are entitled to an earlier
priority date (Opening Br. at 18-19), its expert appears to hint – but does not explicitly state – that the
asserted claims are entitled to a 1998 priority date (*see* Rempel Decl. para 48). Nevertheless, there does not
exist a written description of the asserted claims in the specifications of any of these parent applications, and
BlackBerry is not entitled to the benefit of an earlier (e.g., June 26, 1998 or June 29, 1998) priority date.

MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR
PRELIMINARY INJUNCTION

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003). When this definiteness requirement is not met, the claims of the patent are invalid. *See, e.g., Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (affirming summary judgment of invalidity on indefiniteness grounds).

A patent claim may be invalidated on indefiniteness grounds when a claim term lacks an antecedent basis. *Gardner v. Toyota Motor Corp.*, C 08-0632 RAJ, 2009 WL 4110305, at *6 (W.D. Wash. Nov. 19, 2009) (invalidating patent claim because "the lack of express or implicit antecedent basis for the 'said speed demands" element, and the multiple competing constructions offered render the claim insolubly ambiguous"). An example of claim lacking an antecedent basis is one that "refers to 'said lever' or 'the lever,' where the claim contains no earlier recitation or limitation of a lever and where it would be unclear as to what element the limitation was making reference." MPEP 2173.05(e).

Here, claim 19 is invalid because it twice refers to "the vertical reference line" – a insolubly ambiguous claim limitation. This "the vertical reference line" phrase first appears over 250 words into claim 19. There is no reference to "a vertical reference line" earlier in the claim 19 (or even later in 19), nor is that phrase mentioned anywhere in specification. Claim 19's reference to "a vertical reference" or "the vertical reference" on six separate occasions suggests that "the vertical reference line" may be referring to something else. A person of ordinary skill in the art reading the '964 patent would simply have no idea what is meant by the use of "the vertical reference line" in claim 19. Wobbrock Decl. ¶ 39. This is the classic example of an antecedent basis problem that renders a claim indefinite. *See Gardner*, 2009 WL 4110305, at *6. Claim 19 should accordingly be invalidated under 35 U.S.C. § 112 ¶ 2.

**B.    The Typo Keyboard Does Not Infringe The '964 Patent**

BlackBerry's motion fails to establish a likelihood of success on its '964 patent infringement claim. In contrast to the broad attempt in BlackBerry's motion to claim patentability over any sort of QWERTY keyboard, the asserted claims are in fact directed at (1) a keyboard that is part of a messaging device (the Typo keyboard is not part of a messaging device; it is a stand-alone iPhone case with a keyboard), and (2) a specific keyboard configuration "bisected by a vertical reference" between the left and right halves of the keyboard (the

Typo keyboard does not feature this vertical reference). The Typo keyboard does not meet two limitations of claim 19, and accordingly does not infringe the '964 patent.

### 1. The '964 Patent Requires Construction of Two Key Claim Terms

An assessment of the likelihood of infringement, like a determination of patent infringement at a later stage in litigation, requires a two-step analysis. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003). "First, the court determines the scope and meaning of the patent claims asserted . . . [Secondly,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citations omitted). Step one, claim construction, is an issue of law, *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Step two, comparison of the claim to the accused device, requires a determination that every claim limitation or its equivalent be found in the accused device. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). Those determinations are questions of fact. *Bai v. L & L Wings, Inc.*, 160 F.3d 1350, 1353 (Fed. Cir. 1998).

As an initial matter, the Court should construe two key limitations of claim 19 of the '964 patent: (1) "device," and (2) "bisected by a vertical reference." Although BlackBerry asserts that "[e]ach of the asserted claims (claims 19, 20, and 24) use non-technical terms with which the average lay person should be readily familiar, such as 'keyboard,' 'keys,' 'rows,' 'edges,' 'sides,' and 'same total number'" (Opening Brief at 16), the two aforementioned terms are technical terms (or, at a minimum, lay terms that have a technical meaning in the context of '964 patent) and accordingly require the Court's construction. *See Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1476 (Fed. Cir. 1998) ("[T]echnical terms or words of art or special usages in the claims, if in dispute, are construed or clarified by the court before the construed claims are applied to the accused device.").

With respect to the claim term "device," this is a term that courts regularly construe. *See, e.g., Saffran v. Johnson & Johnson*, 712 F.3d 549, 558-61 (Fed. Cir. 2013) (construing the claim term "device" in four pages and "term itself requires construction beyond those limitations" "in the body of the claim"). With respect to the claim term "bisected by a vertical reference," this term would mean absolutely nothing to a layperson, in

the context of keyboards, even though he or she would know the meaning of the words "vertical" and "reference." Wobbrock Decl. ¶ 28; *see AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1248 (Fed. Cir. 2001) (holding that a trial court must construe claims "consistent[ly] with the scientific and technical context in which it is used in the patent"); *see also EIT Holdings, LLC v. Yelp! Inc.*, C 10-05623 WHA, 2012 WL 174803 (N.D. Cal. Jan. 20, 2012) (construing the term "reference" in a computer algorithm patent); *Skyhook Wireless, Inc. v. Google, Inc.*, CIV.A. 10-11571-RWZ, 2012 WL 4076180 (D. Mass. Sept. 14, 2012) (construing the term "reference symmetry" in a WiFi access point patent); *Ortho-McNeil Pharm., Inc. v. Caraco Pharm. Labs., Ltd.*, 476 F.3d 1321, 1326-28 (Fed. Cir. 2007) (construing "[t]he use of the word 'about' . . . its technological and stylistic context"). These two terms therefore require the Court's construction, and should be construed as follows:

| Claim Term | Typo's Proposed Construction | Intrinsic Evidence |
|---|---|---|
| "device" | messaging device | '964 Patent Abstract ; 1:23-26; 2:39-47; 4:6-9; 4:55-56; 5:12-19; 8:15-16 |
| "bisected by a vertical reference" | a distinct physical vertical aspect that physically divides approximately half of the keys positioned to the left and approximately half the keys positioned to the right | '964 Patent 4:64-5:9 ; Fig. 2 ; Fig. 3 |

The intrinsic evidence cited in the chart above makes clear that the claim term "device" refers to a "messaging device." Wobbrock Decl. ¶ 30; *see, e.g., Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (claims "must be read in view of the specification, of which they are a part"). This claim construction is supported by numerous disclosures in the '964 patent, including:

(1) Claim 19's preamble, which begins, "[a] keyboard for use with a mobile communication device";

(2) The specification's discussion of, and the drawings' depiction of, "messaging device 10";

(3) The statement in the specification that the invention is a "hand-held electronic device with a keyboard optimized for use with the thumbs."

Wobbrock Decl. ¶ 30.

The word "device" in claim 19, in the context of the '964 patent, therefore, refers to "messaging device." Wobbrock Decl. ¶ 31; *see Phillips*, 415 F.3d at 1321 (stating that the "ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent"). The Court should construe this claim term accordingly.

With respect to term "vertical reference," to the extent that this Court declines to invalidate claim 19 for failing to satisfy the written description requirement with respect to this "vertical reference" (see Part IV.B.2, *supra*), the Court should find that the term refers to "a distinct physical vertical aspect that physically divides approximately half of the keys positioned to the left and approximately half the keys positioned to the right." Wobbrock Decl. ¶ 41.

In determining the meaning of "bisected by a vertical reference," Dr. Wobbrock analyzed the plain meaning of the terms "bisect" and "reference" at Merriam-Webster.com:

- **"bisect"**: to divide into two usually equal parts
- **"reference"**: something that refers.

Wobbrock Decl. ¶ 34. According to his Declaration, a reference cannot separate two things--it can only provide the location of something else that does the separation. Wobbrock Decl. ¶ 38. As the definition says, a reference must refer to something else. Wobbrock Decl. ¶ 38. It is nothing unto itself, certainly nothing that can do any "dividing" of physical things. Wobbrock Decl. ¶ 35, 39. Thus, in order for this limitation to have any meaning, Dr. Wobbrock opines that one of ordinary skill in reading claim 19 would expect that some thing must be doing the dividing into two equal parts and that "something" must be physical—not theoretical. Wobbrock Decl. ¶ 35. Therefore, the term "bisected by a vertical reference" must mean "a distinct physical vertical aspect that physically divides approximately half of the keys positioned to the left and approximately half the keys positioned to the right." Wobbrock Decl. ¶ 41.

The intrinsic evidence – Figures 2 and 3, and the corresponding description of Figure 3 – clearly supports this proposed construction. Wobbrock Decl. ¶ 42. Claim 19 describes a vertical reference whereby "approximately half of the keys in each of the respective rows are positioned to the left of the vertical reference and approximately half of the keys in each of the respective rows row are positioned to the right of the vertical reference." '964 Patent, claim 19. As the '964 patent specification explains, this "vertical reference" in the

1   center of the keyboard arises because the keys are "placed at an angle 960 relative to vertical that facilitate[s]

2   easy typing using thumbs," with the left half of the keys at a negative angle and the right half of the keys a

3   positive angle. '964 Patent 5:1-2. This vertical reference is depicted in Figures 2 and 3 of the patent. '964

4   Patent Figs. 2 & 3. This vertical reference is also present in the RIM 850/950 Wireless Handheld device, which

5   BlackBerry states is "almost identical[]" to Figure 2 of the '964 patent (Rempel Decl. ¶ 50) :

6

  

10

11   The term "vertical reference" must therefore refer to the distinct physical separation between the left and right

12   halves of the keyboard as depicted in Figures 2 and 3 of the '964 patent. Wobbrock Decl. ¶ 44. It cannot simply

13   be the existence of an imaginary line running in the middle of a device, as suggested in BlackBerry's opening

14   brief. Wobbrock Decl. ¶ 44. Otherwise, every product on the market would meet that claim because without a

15   specific meaning, everything can be bisected by a vertical reference. Wobbrock Decl. ¶ 44. Moreover, this

16   vertical reference cannot simply be ornamental—it must have a utility of some sort. Here, the specification

17   teaches us that the object of the invention is to facilitate typing with the thumbs (*e.g.*, '964 Patent Abstract) and

18   therefore, the vertical reference is relevant to the angling of the keys for ease of typing. The only logical

19   construction of "vertical reference" is, accordingly, a distinct physical separation of the keyboard's left and

20   right halves. Wobbrock Decl. ¶¶ 41-44.

21

22                    **2.      BlackBerry Will not Prove at Trial that the Typo Keyboard Infringes the '964**

23                              **Patent**

24         BlackBerry is highly unlikely to prove infringement of the asserted claims of the '964 patent, as

25   properly construed, because the accused Typo keyboard (1) is a keyboard and not a messaging device, and (2)

26   is in no way "bisected by a vertical reference." Wobbrock Decl. ¶¶ 31-33, 45-47. First, BlackBerry cannot

27   prove infringement because the Typo keyboard fails to satisfy the "device" limitation of claim 19. Wobbrock

28

Decl. ¶¶ 31-33. In the context of the '964 patent, the claim term "device" refers to a "messaging device." (*See* Part IV.B.1, *supra*) The accused product is just an iPhone case with a keyboard. Hallier Decl. ¶ 29; Wobbrock Decl. ¶ 31. It is not a messaging device: it is not capable of sending and receiving messages such as emails and SMS messages. Hallier Decl. ¶ 29; Wobbrock Decl. ¶ 31. Although the Typo keyboard is intended to be attached to a messaging device (i.e., the iPhone), Hallier Decl. ¶ 29, that does not somehow transform the Typo keyboard into a messaging device. Wobbrock Decl. ¶ 32. Thus, the Typo keyboard is not a "device" within the meaning of the '964 patent, and does not infringe the patent. Wobbrock Decl. ¶ 33.

Blackberry also cannot prove infringement because the Typo keyboard does not meet claim 19's "bisected by a vertical reference" limitation. Wobbrock Decl. ¶¶ 45-47. In the context of the '964 patent the "vertical reference" is "a distinct physical vertical aspect that physically divides approximately half of the keys positioned to the left and approximately half the keys positioned to the right." (*See* Part IV.B.1, *supra*) The Typo keyboard is designed with keys in a ten-column by three-row grid (with the space bar and additional keys in a fourth, bottom row), and it simply does not feature any sort of physical separation that bisects the keyboard's left and right halves. Wobbrock Decl. ¶ 45. The figure below depicts the stark contrast between the keyboard of the patented invention that is "bisected by a vertical reference" (as depicted Figures 2 and 3 of the '964 patent) and the keyboard of the accused product that is arranged in a grid with essentially 10 identical columns with no "vertical reference" bisecting anything:

 

Fig 2

MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR
PRELIMINARY INJUNCTION

1   Wobbrock Decl. ¶ 46. Clearly, the keyboard of the patented invention has this distinct physical separation of

2   the left and right halves of the keyboard, and the Typo keyboard does not. Wobbrock Decl. ¶ 47.

3        Yet, BlackBerry contends that the Typo keyboard is "bisected by a vertical reference" on the basis of

4   its expert, who has drawn a yellow line down the middle of a photo of the Typo keyboard and opined in a

5   conclusory manner that "the yellow line represents the vertical reference." Rempel Decl. ¶ 84. But drawing a

6   yellow line on a photo of the accused product does not create a "vertical reference." Wobbrock Decl. ¶ 48.

7   BlackBerry, thus, will be unable to prove that the accused product satisfies the "bisected by a vertical

8   reference" limitation. Wobbrock Decl. ¶ 48. Because the accused Typo keyboard does not contain at least two

9   elements that are required by claim 19 of the '964 patent, BlackBerry will be unable to meet its burden of

10   proving infringement at trial.

11        **C.**    **The D'775 Patent is Invalid**

12        The D'775 patent, which states a priority date of March 29, 2012 on its face (D'775 Patent p. 1), is

13   invalid under 35 U.S.C. § 102 as anticipated by numerous prior art designs, including BlackBerry's Bold

14   design (released in 2008). The D'775 patent is also invalid under section 103 as rendered obvious by the

15   combination of any number of prior art designs, including BlackBerry's Bold design and a multitude of phones

16   with "straight" keyboards that were on the market before 2012. Wobbrock Decl. ¶ 51.

17        It has been well established for over a century that in assessing design patents, the same test must be

18   used for both infringement and anticipation. *Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233,

19   1239 (Fed. Cir. 2009). This general rule derives from the Supreme Court's proclamation 120 years ago in the

20   context of utility patents: "[t]hat which infringes, if later, would anticipate, if earlier." *Peters v. Active Mfg.*

21   *Co.*, 129 U.S. 530, 537 (1889). The same rule applies for design patents. See *Bernhardt, L.L.C. v. Collezione*

22   *Europa USA, Inc.*, 386 F.3d 1371, 1378 (Fed. Cir. 2004) abrogated by *Egyptian Goddess, Inc. v. Swisa, Inc.*,

23   543 F.3d 665 (Fed. Cir. 2008) (explaining that the test for determining anticipation of a design patent is the

24   same as the test for infringement). Therefore, we look to the prior art. The D'775 patent is a continuation of

25   application N. 29/417,052 filed on March 29, 2012. Hence, designs predating that filing date constitute prior

26   art and can be used to invalidate the patent.

27

28

Here, the prior art is rampant with keyboards that embody all of the claimed features of the D'775 patent. Wobbrock Decl. ¶ 49. Mr. Lucente specifies those features at page 16 of his declaration. However, these features are far from novel and would be well known to "an ordinary observer familiar with the prior art." Wobbrock Decl. ¶ 49; *Egyptian Goddess, Inc.*, 543 F.3d at 681. In fact, BlackBerry itself touts that "[t]he central design elements of the Ergo Surf keyboard have been used in every BlackBerry flagship device since 2008." Opening Brief, p. 4. BlackBerry readily admits that even the BlackBerry Q10's "physical keyboard continues to incorporates bars above the rows of keys having the distinctive sculpted appearance of the thumb-optimized ergo-surf design that was first introduced with the Bold 9000." Opening Brief, p.4.

Not only has BlackBerry itself displayed the "central design elements" of the D'775 patent for at least four years before the patent's priority date, so has every other phone maker in the industry. Wobbrock Decl. ¶ 50. There are countless cell phones with the exact same contoured keys shown in the patent. Wobbrock Decl. ¶ 50. The Hallier Declaration's large sampling of devices, most of which predate the filing date of the D'775 patent, demonstrates that these features are far from new or original in any way. Hallier Decl. ¶¶ 13-19, 21-26. Based on a review of the prior art, one must come to the inescapable conclusion that the D'775 patent (or the Q10) resembles the BlackBerry Bold far more than it resembles the Typo keyboard. Wobbrock Decl. ¶ 51. The graphic below makes that point very clear. The D'775 patent is accordingly anticipated by the BlackBerry Bold, and is invalid. Wobbrock Decl. ¶ 51.



| BOLD | D'775 | TYPO |

MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR PRELIMINARY INJUNCTION

**D.     The Typo Keyboard Does Not Infringe the D'775 Patent**

In addition to being invalid, the D'775 patent is simply not infringed by the Typo keyboard. The test

for infringement of a design patent is whether an "ordinary observer" would consider the patented design and

the allegedly infringing design as "substantially the same." *Egyptian Goddess, Inc.*, 543 F.3d at 678. Under this

test, the prior art "provides . . . a frame of reference" that is used to compare the claimed design and accused

design. *Id.* at 677. In assessing design patent infringement, the Federal Circuit has warned against "assigning

exaggerated importance to small differences between the claimed and accused designs relating to an

insignificant feature simply because that feature can be characterized as a point of novelty." *Id.* In this regard,

"scope of protection afforded [the patented design] falls in a narrow range" when the prior art is "crowded with

many references relating to the design of the same type of [products]." *Wing Shing Products (BVI) Co. Ltd. v.*

*Sunbeam Products, Inc.*, 665 F. Supp. 2d 357, 361 (S.D.N.Y. 2009) *aff'd*, 374 F. App'x 956 (Fed. Cir. 2010).

Under the applicable standards and in light of the prior art, the Typo keyboard does not infringe. Wobbrock

Decl. ¶ 52.

**1.     The Prior Art Sets the Scope of the D'775 Patent**

In deciding whether the Typo keyboard infringes the D'775 patent, "the scope of the patent" must first

be assessed "in relation to the prior art." *Egyptian Goddess, Inc.*, 543 F.3d at 676. BlackBerry argues that the



D'775 patent does not need claim interpretation. This is incorrect for

at least two reasons. First, the prosecution history provides

limitations that must be construed. During the prosecution of the

D'775 patent, the examiner found that upon "cursory consideration,"

the prior art (U.S. Patent No. D565,578) "appear to be a curved

version of the design claimed herein." Notice of Allowability,

mailed April 10, 2013, at p.2. The implication there was that simply

straightening the keyboard shown in design patent D565,578 (see

below) would have been insufficient to obtain the D'775 patent. *See*

0167-1001                                                19
MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR
PRELIMINARY INJUNCTION

*id.* Nonetheless, the examiner explained that what set the D'775 apart were some "differences in several design aspects between the application and the references." *Id.* In so doing, the examiner pointed out that (1) the application contained plain elongated strips between the rows of keys ("frets"); (2) that said frets were extended "outward to the right and left beyond the width of the keys"; (3) the proportioning of the height of the frets compared to the height of the keys; and (4) "the straightening of the three top rows of keys while leaving the curve at the bottom of the lowest key row." *Id.* Based on this history, it is clear that BlackBerry has not created "a particular feature . . . that departs conspicuously from the prior art." *Egyptian Goddess*, 543 F.3d at 678-79. Thus, we must look at the D'775 patent with those limitation in mind.

### 2.   All Functional Elements Must Be Ignored

In addition to the limitations found in the prosecution history, BlackBerry is also limited to claim only the non-functional elements of its design. All other functional elements must be ignored. *Richardson v. Stanley Works, Inc.*, 597 F. 1288, 1293-94 (Fed. Cir. 2010) (holding that the trial court properly "factored out the functional aspects" of the patented design). On this basis, the claim of the D'775 patent does not include the following functional elements: the shape, angle and position of the keys and the frets.

BlackBerry concedes that a significant part of BlackBerry's keyboard design is functional. In its own advertising, BlackBerry touts the functionality of its keyboard: "Every one of these 35 keys was shaped, angled and positioned to make your typing experience fast, accurate, and dare we even say, heavenly?" Douglas Decl. Ex. 3. Therefore, as a starting point, BlackBerry should not be able to claim design protection for the shape, angle, and position of its keys. Wobbrock Decl. ¶¶ 60-65, 69; *Lee v. Dayton-Hudson Corp.*, 838 F.2d 1186, 1188 (Fed. Cir. 1988) ("Design patents do not and cannot include claims to the structural or functional aspects of the article"). Nor should BlackBerry receive protection for the "fret." Frets provide a point of reference for typing. Wobbrock Decl. ¶¶ 66-69. They give a user both a visual and tactile reference when handling the keyboard. Wobbrock Decl. ¶¶ 66-69. The fact that the frets are recessed below the keys is particularly utilitarian since this feature provides a gap between adjacent rows that enhances the tactile reference. Wobbrock Decl. ¶ 68. It should be noted that raised frets would provide a similar tactile reference. Wobbrock Decl. ¶ 68. The fact that there are four frets is also useful, as it allows one to set his or her hand on the

1    keyboard knowing immediately where the hand rests. Wobbrock Decl. ¶ 68. This allows for faster and more

2    accurate typing.[5] Wobbrock Decl. ¶ 68.

3              **3.      The D'775 Patent is not Infringed Because the Typo Keyboard Is Not**

4                        **Substantially The Same**

5              Once the functional elements are removed, and once the claimed design is properly interpreted in light

6    of the prosecution history and the prior art, it is highly unlikely that "a person who is either a purchaser of, or

7    sufficiently interested in, the [BlackBerry]," giving such attention as a purchaser usually gives, would find that

8    the designs are substantially the same, thereby inducing such a person to buy the Typo keyboard thinking that

9    it is a BlackBerry. Wobbrock Decl. ¶ 70; *Gorham Co. v. White, 81 U.S. 511, 528 (1871)*; *Arminak & Assocs. v*

10   *. Saint-Gobain Calmar, Inc.*, 501 F.3d 1314, 1323 (Fed. Cir. 2007).

11

12

13

14

15

16                                   

17

18

19

20             No such confusion can take place here as the Typo keyboard is meaningfully different from the D'775

21   patent. Wobbrock Decl. ¶ 71. The most obvious differences are (1) the frets in the Typo keyboard do not

22   extend past the keys as such is claimed in the D'775; (2) the bottom row of the Typo keyboard is straight

23   across and not curved at all, unlike the bottom row of the D'775, which is shorter than the row above it and

24   curved; (3) the Typo keyboard has four full rows of keys with two rounded corners at the bottom whereas the

25

26   _____

     [5] Moreover, BlackBerry is in no position to argue that the frets, or the "raised bars" are not utilitarian. In U.S.
27   Patent No. 8,400,400, assigned to BlackBerry, they claim a "keyboard comprising at least two elongated
     rails." Taillieu Decl., Ex. 7 (U.S. Patent No. 8,400,400, Claim 1).

28

D'775 has three rows with a fully curved, significantly shorter fourth row; (4) the frets of the Typo keyboard are significantly thinner than the frets of the D'775; (5) the Typo keyboard is significantly narrower than the D'775; (6) the Typo keyboard features a key representing Apple's iconic home button, which the D'775 does not have; (7) the Typo keyboard features a keyboard backlight key that can be pressed to illuminate the keyboard when the Typo keyboard is used with the iPhone, which the D'775 does not have; and (8) most importantly, the Typo keyboard is not a phone and as such an ordinary observer familiar with the prior art would be able to differentiate a cell phone case with a keyboard (Typo) from a cell phone (BlackBerry). Wobbrock Decl. ¶ 71.

Because all of those differences between the Typo keyboard and the claim of the D'775 patent, an ordinary observer would be hard-pressed to conclude that the two designs are "substantially the same." Wobbrock Decl. ¶ 70. As such, the Typo keyboard does not infringe the D'775 patent, and BlackBerry cannot there establish a likelihood of success on the merits with respect to the D'775 patent.

> **E.   BlackBerry's Patent Infringement Claims are Barred by Equitable Estoppel**

BlackBerry's patent infringement claims are unlikely to succeed on the merits for the additional reason that they are barred by the doctrine of equitable estoppel. BlackBerry is estopped from pursuing this lawsuit against the Typo keyboard because it has declined to enforce the '964 and D'775 patents against any of the over 40 cell phones that have been on the market since 2006 that infringe its interpretation of these patents. *See Electromotive Div. of Gen. Motors Corp. v. Transp. Sys. Div. of Gen. Elec. Co.*, 275 F. Supp. 2d 850, 862 (E.D. Mich. 2003) (denying motion for preliminary injunction upon finding that accused infringer had a probability of success on the merits of an equitable estoppel claim, and noting that the patentee "did not aggressively protect its patents against competitors for the last decade"). "Estoppel is an equitable defense to a charge of patent infringement and, if proven, may entirely bar an infringement suit." *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed. Cir. 1995); *Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267 1272–73 (Fed. Cir. 1990).[6]

---

[6] There are three elements to an equitable estoppel claim: (1) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that it does not intend to enforce the patent against the alleged (footnote continued)

As can be seen in the exhibits attached to the Hallier Declaration, there have been many cell phones on the market with a three by ten keyboard, vertically aligned, with the key configuration claimed in claim 19 and/or containing the design of the D'775 patent. Hallier Decl. ¶¶ 13-19, 21-26 & Hallier Decl. Exhs. 1-12. Over at least the past 8 years since these products have been on the market, BlackBerry has not taken any action to enforce its '964 patents against these other companies.

All three elements of equitable estoppel are met here. BlackBerry's "intentionally misleading silence" in the face these numerous other cell phones on the market satisfies the first element. See *Broomall Industries v. Data Design Logic Systems*, 786 F.2d 401, 406 (Fed. Cir. 1986). The second element is satisfied because Typo relied on BlackBerry's silence with regard to these competing products. (See [company affidavit]) And the third element, material prejudice, is established by Typo's "change of economic position" in that they made over $1.4 million of investment in the Typo keyboard on the basis of BlackBerry's inaction against the multitude of other similar cell phones on the market. *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1043 (Fed. Cir. 1992). Accordingly, Typo is likely to succeed on its equitable estoppel defense at trial.

## V.    BLACKBERRY SUFFERS NO IRREPARABLE HARM

The Federal Circuit has made clear that, in order to obtain a preliminary injunction, BlackBerry must make a "clear showing" of a "likelihood of substantial and immediate irreparable injury." *Apple, Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) "The burden is [on BlackBerry] to demonstrate that its potential losses cannot be compensated by monetary damages." *Automated Merch. Sys., Inc. v. Crane Co.*, 357 F. App'x 297, 301 (Fed. Cir. 2009). This burden requires more than "allegations and conclusory affidavits" from BlackBerry itself. *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990). In addition, lost market share speculation by BlackBerry cannot warrant an injunction. *See, e.g., Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 2008 WL 114361, at *6 (D. Del. Jan. 8, 2008) (15% drop in market share did not justify injunctive relief); *Mylan Labs., Inc. v. Leavitt*, 484 F.

---

infringer; (2) the alleged infringer relies upon the patentee's conduct; and (3) due to the reliance, the alleged infringer will be materially prejudiced if the patentee is permitted to proceed with its infringement suit. ABB Robotics, 52 F.3d at 1063.

1   Supp. 2d 109, 123 (D.D.C. 2007) (irreparable injury "must be such that 'it cause[s] extreme hardship to the

2   business, or even threaten[s] destruction of the business'").

3          There is simply no irreparable harm here. The only two arguments presented to support irreparable

4   harm are that BlackBerry will lose both business opportunities and good will if sales of the Typo keyboard are

5   not stopped. First, BlackBerry has made no showing that the Q10 has acquired any goodwill. Although

6   BlackBerry provides some support for the notion that "BlackBerry" has, as a company, acquired some

7   goodwill, such a generalized notion is insufficient. Moreover, to the extent that BlackBerry had acquired some

8   goodwill through 2008, recent press coverage and public perception tells a different story. A sampling of the

9   recent news coverage of BlackBerry's troubles is attached to the Hallier Declaration. Hallier Decl. ¶¶ 43-52 &

10  Hallier Decl. Ex. 18. As of late, a typical headline regarding BlackBerry reads more like an obituary than

11  anything else: "BlackBerry Handsets are Nearly Extinct." Hallier Decl. ¶ 49.

12         As to BlackBerry's argument that it will lose "business opportunities," the Typo iPhone case and

13  keyboard is not "a competing product" to a BlackBerry phone. Hallier Decl. ¶ 41. Purchasers of the Typo

14  keyboard are iPhone owners who are looking for a case with a removable keyboard. Hallier Decl. ¶ 41. They

15  are *not* purchasers of cell phones. Hallier Decl. ¶ 41. In fact, in order for anyone to benefit from a Typo

16  keyboard, one needs to already own an iPhone. Hallier Decl. ¶ 41. As such, it cannot "steal[] BlackBerry's

17  sales." Opening Brief, p.21. Additionally, the Typo keyboard and BlackBerry are never sold in the same store

18  or on the same website. Hallier Decl. ¶ 30. Typo keyboards are sold exclusively on the Typo's website found at

19
20  www.typokeyboards.com and Blackberries Q10s are sold mainly online at www.blackberry.com—although a

21  few retail stores still carry their devices. Hallier Decl. ¶ 30. There is no evidence that anyone wishing to

22  purchase a BlackBerry would even be introduced to the Typo keyboard, as each product's purchaser would

23  likely do a very different online search.[7]

24
      ───────────────

25  [7] BlackBerry's argument that that it will lose Q10 sales as a direct result of the Typo keyboard is completely
    tenuous and not based in reality. Hallier Decl. ¶¶ 44-45, 48-49. BlackBerry proposes a far-fetched scenario
26  whereby a consumer in the market for a new cell phone who just happens to be deciding between the iPhone
    and the Q10 (assuming they can even find a store that sells the Q10) just happens to learn about the Typo
27  keyboard and then decides to buy an iPhone over the Q10 simply because of the Typo keyboard and not
    because the iPhone is superior to the Q10 in any other way. (Opening Brief, p. 23) The cause-and-effect
28  (footnote continued)

Yet another reason why the Typo keyboard is unlikely to irreparably harm BlackBerry is that the Typo keyboard focuses its marketing efforts on the consumer market only—a market that BlackBerry is abandoning. "BlackBerry CEO John Chen . . . waved the white flag in the high-end consumer market and said that BlackBerry for the foreseeable future would only design a more limited number of devices aimed at high-end enterprise users. As the [Wall Street] Journal details, sales of both the BlackBerry Z10 and BlackBerry Q10 have been abysmally bad and have forced BlackBerry to write down around $2.6 billion in unsold inventory so far." Hallier Decl. ¶ 48. As more fully discussed above, Typo is only for sale on its own website and has no plans to compete with BlackBerry's "enterprise users." Hallier Decl. ¶ 30.

Finally, as to the '964 patent, BlackBerry has allowed dozens of cell phones that (according to its interpretation of claim 19) infringe claim 19. Hallier Decl. ¶¶ 13-19, 21-26. "The failure to bring suit against other potential infringers may be relevant to an analysis of irreparable harm, but only when it indicates . . . indifference in enforcing one's patent." *Polymer Technologies, Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996). As can be seen in Part IV.A.1, *supra*, there have been many cell phones with a three by ten keyboard, vertically aligned, with the key configuration claimed in claim 19.

It is unfeasible that a small start-up company, running at an operating loss, who has approximately 4,000 units of a cell phone case containing a physical keyboard could seriously pose any threat to BlackBerry's market share or good will. Hallier Decl. ¶ 31. That task is reserved to Apple, Samsung, Motorola, and Microsoft. Hallier Decl. ¶ 26. If and when Typo is found to have infringed any of BlackBerry's patents (which it has not), BlackBerry's market share will be exactly what it is with or without Typo, plus or minus a fraction of the 4,000 units sold by Typo. As such, then and only then, will the Court be able to fashion monetary relief which will be more than adequate. *Automated Merch. Sys., Inc.*, 357 F. App'x at 301 (reversing trial court's decision to grant preliminary injunction "[g]iven the lack of evidence supporting any type of harm that would not be compensable through monetary damages"). In fact, even Steve Zipperstein, BlackBerry's General

---

problem here is apparent (as well as the complete lack of evidence). The reason for BlackBerry's demise in the marketplace has nothing to do with its keyboard. The reason why people do not buy BlackBerrys is because (1) their operating system and (2) the complete dearth of Apps.

MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR
PRELIMINARY INJUNCTION

Counsel and Chief Legal Officer believes that "fair compensation" is enough to vindicate BackBerry when he stated in a press conference that "[w]e are flattered by the desire to graft our keyboard onto other smartphones, but we will not tolerate such activity without fair compensation for using our intellectual property and our technological innovations." Taillieu Dec. Ex. 8.  BlackBerry cannot possible establish that it will suffer irreparable harm in the absence of a preliminary injunction.

## VI. THE BALANCE OF THE HARMS WEIGHS STRONGLY AGAINST AN INJUNCTION

A further basis for denying an injunction is that the hardship to Typo far outweighs any speculative hardships alleged by BlackBerry if an injunction does not issue. *See Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 683 (Fed. Cir. 1990) (stating that "hardship on a preliminarily enjoined manufacturer who must withdraw its product from the market before trial can be devastating" and that a court may properly deny injunction where "a grant might destroy [the defendant] while a denial would leave [the plaintiff] a going concern"); *H. Jay Spiegel & Assocs., P.C. v. Spiegel.*, 652 F. Supp. 2d 630, 636 (E.D. Va. 2008) (denying preliminary injunction where "any harm Plaintiff will suffer going forward is speculative and difficult to quantify" and "[d]efendant, on the other hand, would be immediately and severely harmed if the Court granted an injunction."). If it is not allowed to fulfill its remaining orders, Typo will be put out of business and the significant investment into its research and development will be all for nothing. Hallier Decl. ¶ 33. In contrast, BlackBerry's sales will likely not be materially affected by Typo at all. Typo can only produce less than 10,000 units per month and has a dramatically limited shelf life as Apple is expected to release a new iPhone 6 by the summer of 2014. Hallier Decl. ¶¶ 31-33. In contrast, BlackBerry has reported sales figures of at least 4.5 million units in the third quarter of 2013 alone and although these numbers are dropping, they still overshadow Typo's sales by millions of units every month. Hallier Decl. ¶ 53. The balance of hardships tips substantially in favor of denying an injunction here.

## VII. THE PUBLIC GOOD WILL BE HARMED IF TYPO IS ENJOINED

Typo's innovative keyboard technology will benefit consumers who have been in search of a satisfactory means of typing on the iPhone. Hallier Decl. ¶¶ 7-8, 34-36. The public interest favors having this product available to consumers. *See Abbott Labs. v. Andrx Pharm., Inc.*, 452 F.3d 1331, 1328 (Fed. Cir. 2006)

(public best served by allowing both competitive products on the market); *see also Graham Webb Int'l v. Helen Curtis Inc.*, 17 F. Supp. 2d 919, 931 (D. Minn. 1998) (stating that in the absence of a "clear-cut case of infringement," the public interest lies with "allowing continued competition between the products until after a full adjudication of the issues involved"); *Medi–Flex, Inc. v. Nice–Pak Products, Inc.*, 422 F. Supp. 2d 1242 (D. Kan. 2006) (denying preliminary injunction because "[p]ublic interest favors competition in the marketplace.").

## CONCLUSION

For the reasons stated above, the Court should deny BlackBerry's Motion for Preliminary Injunction and proceed with the orderly discovery process to adjudicate the claims on a full record.

Dated: February 5, 2014

Respectfully submitted:

THE TAILLIEU LAW FIRM LLP
OLIVIER A. TAILLIEU
RAFFI V. ZEROUNIAN

By: _____
Attorneys for Defendant TYPO PRODUCTS LLC

MEMORANDUM OF P&A RE: TYPO PRODUCTS LLC'S OPPO. TO BLACKBERRY'S MOTION FOR
PRELIMINARY INJUNCTION