1

2

3

4               UNITED STATES DISTRICT COURT

5             NORTHERN DISTRICT OF CALIFORNIA

6

7   BLACKBERRY LIMITED,                    Case No.  14-cv-00023-WHO

            Plaintiff,
8
                                          **ORDER GRANTING BLACKBERRY'S**
9       v.                                **MOTION FOR A PRELIMINARY**
                                          **INJUNCTION**
10  TYPO PRODUCTS LLC,
                                          Re: Dkt. Nos. 11, 12
            Defendant.
11

12                            **INTRODUCTION**

13          Plaintiff BlackBerry Limited moves for a preliminary injunction barring defendant Typo

14  Products LLC from selling its add-on keyboard for the iPhone which, BlackBerry alleges, violates

15  BlackBerry's patents.  Dkt. No. 12.  BlackBerry has established a likelihood of proving that Typo

16  infringes the patents at issue and Typo has not presented a substantial question of the validity of

17  those patents.  In addition, the balance of equities and the public interest weigh in favor of

18  granting a preliminary injunction.  I therefore GRANT BlackBerry's motion for a preliminary

19  injunction.

20                            **BACKGROUND**

21          BlackBerry manufactures mobile smartphones which, according to BlackBerry, feature an

22  iconic keyboard design.  Mot at 1.  Typo has developed a case for iPhones which includes a

23  physical keyboard.  iPhones, as sold, lack physical keyboards.  On January 3, 2014, BlackBerry

24  filed suit against Typo, alleging trade dress infringement, trade dress dilution, unfair business

25  practices, unjust enrichment, and infringement of various BlackBerry patents.  Dkt. No. 1.  Typo

26  filed an answer to that complaint on February 18, 2014.  Dkt. No. 27.

27           On January 22, 2014, BlackBerry filed a motion for a preliminary injunction barring Typo

28  from importing, marketing, offering to sell or selling Typo's keyboard for the iPhone.  Dkt. No.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    12.[1]  The motion for a preliminary injunction is based solely on Typo's alleged infringement of

2    claims 19, 20, and 24 of BlackBerry's U.S. Patent No. 7,629,964[2] (the "'964 Patent") and U.S.

3    Design Patent No. D685,775[3] (the "D'775 Patent"), which claims the design in FIG. 2 below.

4    BlackBerry asserts that the keyboard of the BlackBerry Q10 phone, shown below next to FIG. 2,

5    embodies the D'775 Patent.  Mot. at 10.

    

FIG.2

12    Typo is a start-up company founded in August 2013.  Hallier Decl. ¶ 2 [Dkt. No. 25-22].

13    Typo asserts that its sole product is an "iPhone accessory consisting of a protective case with a

14    physical keyboard."  Typo Opp. at 1 (citing Hallier Decl. ¶ 6).  Development of the Typo

15    keyboard began around December 2011 and the product launched on January 7, 2014.  Hallier

16    Decl. ¶ 5.  Photos of the Typo case and a close up of its keyboard are shown below:

    

---

[1] For good cause shown, I grant BlackBerry's motion to file under seal (Dkt. No. 11) limited portions of BlackBerry's motion for a preliminary injunction, the supporting declarations of Douglas and Rempel and Exhibits 1 and 2 to the Rempel declaration.

[2] The '964 Patent, entitled Hand-Held Electronic Device with a Keyboard Optimized for Use with the Thumbs, was filed on April 27, 2007, issued on December 8, 2009, and claims priority to a patent application filed on June 26, 1998.

[3] The D'775 Patent, entitled Handheld Electronic Device, claims "the ornamental design for a handheld electronic device" shown in FIG 2.  The D'775 Patent claims a priority date of March 29, 2012.  *Id*. at Ex. 2.

2

**LEGAL STANDARD**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction must establish (1) likelihood of success on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in plaintiff's favor, and (4) that an injunction is in the public interest. *Id.* at 20. In order to demonstrate a likelihood of success on the merits in a patent infringement case, a plaintiff must establish that it will likely prove that the defendant infringes the patents-in-suit and that it will likely withstand the defendant's challenges to the validity and enforceability of the patents-in-suit. *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). If the accused infringer "raises a substantial question concerning either infringement or validity, *i.e.,* asserts an infringement or invalidity defense that the patentee cannot prove 'lacks substantial merit,' the preliminary injunction should not issue." *Id.* at 1350-51.

**DISCUSSION**

BlackBerry asserts that it is likely to succeed on the merits of its claims, that a preliminary injunction is necessary to prevent irreparable harm, that the balance of equities favors BlackBerry, and that a preliminary injunction serves the public interest. Typo, on the other hand, argues that its keyboard does not infringe the D'775 and '964 Patents, that those patents are invalid, and that equitable estoppel bars BlackBerry's infringement claims because BlackBerry has failed to enforce the patents at issue against other parties offering similar keyboards. Typo also argues that BlackBerry has not made an adequate showing of irreparable harm and that the balance of harms and the public interest weigh against an injunction.

**I. LIKELIHOOD OF SUCCESS**

**A. D'775 Patent**

Typo argues that its keyboard does not infringe the D'775 Patent and that the D'775 Patent is invalid for anticipation and obviousness.

United States District Court
Northern District of California

1.   Claim construction

The parties dispute whether claim construction is necessary to conduct the infringement analysis for the D'775 patent.  Generally, a design "is better represented by an illustration 'than it could be by any description and a description would probably not be intelligible without the illustration.'"  *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 679-80 (Fed. Cir. 2008) (citing *Dobson v. Dornan,* 118 U.S. 10, 14 (1886)).  Accordingly, "the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design."  *Egyptian Goddess*, 543 F.3d at 679.  Issuing a verbal description of the claimed design creates a "risk of placing undue emphasis on particular features of the design and the risk that a finder of fact will focus on each individual described feature in the verbal description rather than on the design as a whole."  *Id*. at 679-80.  Nonetheless, "a district court's decision regarding the level of detail to be used in describing the claimed design is a matter within the court's discretion, and absent a showing of prejudice, the court's decision to issue a relatively detailed claim construction will not be reversible error."  *Id*. at 679.

In this case, BlackBerry asserts that no claim construction is necessary because the Court may conduct its infringement analysis by comparing the Typo keyboard directly to the illustrations in the D'775 patent and the BlackBerry Q10, which embodies the D'775 Patent.  BlackBerry Mot. at 11.  In opposition, Typo argues that the prosecution history of the D'775 Patent "provides limitations that must be construed" because the patent examiner distinguished the D'775 Patent from an earlier BlackBerry design patent, D'565,578 (the "D'578 Patent")[4], on the bases that the D'775 Patent: (1) contains plain elongated strips between the rows of keys ("frets"), (2) these frets extend outward to the right and left beyond the width of the keys, (3) has different proportions between the height of the frets compared to the height of the keys, and (4) the top three rows are straight while the lowest row of keys has a curve at the bottom.  *Id.* at 20.  Typo does not explicitly specify how it wants the D'755 patent construed.

---

[4] BlackBerry asserts that the D'578 Patent is embodied in the keyboard of the BlackBerry Bold phone that was released in 2008.  BlackBerry Reply at 9.

1    Prosecution history estoppel does not apply in this case because BlackBerry did not modify

2    or limit its claims as a condition for securing the patent.  To the extent that Typo argues that only a

3    few key features distinguish the D'775 from the prior art, those key distinctions are captured in the

4    infringement and anticipation analyses, in which the "ordinary observer" is deemed

5    knowledgeable of the prior art.  *See, e.g., Egyptian Goddess,* 543 F.3d at 676, at 682.

6       Typo also argues that claim construction is necessary because BlackBerry may claim only

7    the non-functional elements of its design and all functional elements must be ignored.  Typo Opp.

8    at 19-20.  Typo argues that BlackBerry, through its advertising, concedes that a significant part of

9    BlackBerry's keyboard design is functional,[5] and that "BlackBerry should therefore not be able to

10   claim design protection for the shape, angle, and position of its keys," or for the "fret," which

11   Typo argues provides a visual and tactile reference for typing.  *Id*.  BlackBerry responds that no

12   elements of the D'775 patent are dictated by function and that Typo fails to address the standard

13   for proving functionality.  BlackBerry Reply at 5.

14      BlackBerry is correct.  That aspects of BlackBerry's keyboard design are purportedly

15   superior to other designs does not render those aspects functional within patent law.  Elements of a

16   design are functional if they are "dictated by their functional purpose."  *Richardson v. Stanley*

17   *Works, Inc.*, 597 F.3d 1288, 1294 (Fed. Cir. 2010) ("The jaw, for example, has to be located on the

18   opposite end of the hammer head such that the tool can be used as a step. The crowbar, by

19   definition, needs to be on the end of the longer handle such that it can reach into narrow spaces.

20   The handle has to be the longest arm of the tool to allow for maximum leverage. The hammer-

21   head has to be flat on its end to effectively deliver force to the object being struck.").  That is not

22   the case here.  It is not sufficient that the claimed design performs the desired function better or is

23   "useful," as Typo appears to contend.

24      Based on the preceding discussion, I find that written claim construction is neither

25

26

27   _____

     [5] Typo refers to a BlackBerry advertisement which states: "Every one of these 35 keys was
     shaped, angled, and positioned to make your typing experience fast, accurate, and dare we even

28   say, heavenly?"  Typo Opp. at 20 (citing Douglas Decl. Ex. 3).

United States District Court
Northern District of California

"necessary [n]or helpful" in this case.[6] *Egyptian Goddess*, 543 F.3d at 679.  I will conduct the infringement analysis by comparing the Typo keyboard directly to the illustrations in the D'775 patent.

       2.  Infringement

An accused design infringes a design patent if "an ordinary observer, taking into account the prior art, would believe the accused design to be the same as the patented design." *Egyptian Goddess*, 543 F.3d at 670, 682; *see also Gorham Co. v. White*, 81 U.S. 511, 528 (1871) ("If, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the first one patented is infringed by the other.").

BlackBerry asserts that "numerous design similarities create the impression that the Typo Keyboard is the same design as the D'775 patent."  BlackBerry Mot. at 12.  BlackBerry's expert, Sam Lucente, states that the Typo Keyboard and the D'775 design both use:

(1) An equally sized horizontal fret above each of the four rows of keys;

(2) Three rows of ten rectangular keys that appear roughly rectangular between the horizontal frets;

(3) Keys that have contoured surfaces;

(4) Keys that are evenly distributed across each row and centered on a vertical center line;

(5) The surface of each key in the top three rows has a planar area and a raised area that creates a sculpted curve extending from the lower edge to the upper edge of the key, curving away from the vertical center line;

(6) Along the vertical center line of the design, the adjacent sculpted curves form a v-shaped pattern;

(7) A lower row of keys below the fourth horizontal fret with a larger rectangular key centered vertically and having a u-shaped planar area, and smaller keys that have a planar area and a raised area that creates a sculpted curve extending from the lower edge to the upper edge of the key, curving away from the vertical center line;

(8) The lower row of keys having a bottom edge that roughly follows the curvature of the

---

[6] Typo tacitly concedes that claim construction is not necessary apart from the two discrete issues it raises, discussed above.

bottom edge of the device; and

(9) No conspicuous space or materials separating keys from each other or from the horizontal frets.

Lucente Decl. ¶¶ 54-57.

Typo does not dispute that both designs use the features identified by Mr. Lucente. However, Typo argues that an ordinary observer would not find that the designs the same because the Typo keyboard is "meaningfully different from the D'775 Patent." Typo Opp. at 21. According to Typo, the "most obvious differences" are:

(1) the frets in the Typo keyboard do not extend past the keys as is claimed . . .;

(2) the bottom row of the Typo keyboard is straight across and not curved at all, unlike the bottom row of the D'775, which is shorter than the row above it and curved;

(3) the Typo keyboard has four full rows of keys with two rounded corners at the bottom whereas the D'775 has three rows with a fully curved, significantly shorter fourth row;

(4) the frets of the Typo keyboard are significantly thinner . . . ;

(5) the Typo keyboard is significantly narrower . . . ;

(6) the Typo keyboard features a key representing Apple's iconic home button, which the D'775 does not have;

(7) the Typo keyboard features a keyboard backlight key that can be pressed to illuminate the keyboard when the Typo keyboard is used with the iPhone, which the D'775 does not have; and

(8) most importantly, the Typo keyboard is not a phone and as such an ordinary observer familiar with the prior art would be able to differentiate a cell phone case with a keyboard (Typo) from a cell phone (BlackBerry).

Typo Opp. at 21-22 (citing Wobbrock Decl. ¶ 71).

BlackBerry has shown a likelihood of establishing that an ordinary observer, taking into account the prior art, would believe that the design of Typo's keyboard is the same as the design patented in the D'775 patent. Just as issuing a verbal description of a claimed design creates a "risk of placing undue emphasis on particular features of the design . . . rather than on the design as a whole," *Egyptian Goddess*, 543 F.3d at 679-80, so too does a verbal description of similarities

7

1    between an accused and patented design.  That is certainly the case here.  A description of what

2    makes the designs at issue appear the same to an ordinary observer is no substitute for a visual

3    comparison of the accused and patented designs.  Nonetheless, I agree that the ordinary observer

4    would think that the features identified by Mr. Lucente as used in both designs create the

5    impression that the Typo keyboard is the same design as the D'775 patent.

6         The differences that Typo refers to do not alter the overall impression that the two designs

7    are the same.  The first, second, third, fourth, sixth, and seventh differences identified by Typo are

8    insignificant and do not alter the overall appearance of the design.  *See, e.g., Egyptian Goddess*,

9    543 F.3d at 677 (the "proper inquiry" is "whether the accused design has appropriated the claimed

10   design as a whole").  As for the fifth difference, while the Typo keyboard does appear to be

11   narrower than BlackBerry's Q10, which embodies the D'775 patent, the D'775 patent itself is not

12   limited to any particular size.  Moreover, the purported difference in size between the designs is

13   not significant to the infringement analysis; what is significant is the size of the features in the

14   design in proportion to the size of other features *within* the same design.  In that regard, the

15   designs appear to be the same.  Finally, Typo's assertion that the designs are different because "the

16   Typo keyboard is not a phone and as such an ordinary observer familiar with the prior art would

17   be able to differentiate a cell phone case with a keyboard (Typo) from a cell phone (BlackBerry)"

18   fails because the only portion of the handheld device that is claimed in the D'775 patent is the

19   keyboard.  *See* D'775 patent at 1 ("The broken lines in the drawings of the handheld electronic

20   device are for showing portions of the article and form no part of the claimed design.").

21                   3.   Invalidity — anticipation

22        The "ordinary observer" test for assessing infringement of a design patent also governs

23   anticipation analyses.  *See, e.g., Int'l Seaway Trading Corp. v. Walgreens Corp.*, 589 F.3d 1233,

24   1240 (Fed. Cir. 2009) ("the ordinary observer test must logically be the sole test for anticipation as

25   well").  Accordingly, a prior art design anticipates a claimed design if an ordinary observer, taking

26   into account the prior art, would believe the patented design is the same as the prior art design.

27        Typo argues that the D'775 Patent is anticipated by "numerous prior art designs," but the

28   only specific alleged anticipatory reference that it mentions is the BlackBerry Bold design released

8

in 2008.  Typo Opp. at 17.  Without explanation, Typo's expert, Dr. Jason Wobbrock, opines that "the D'775 Patent resembles the BlackBerry Bold more than it resembles the Typo keyboard" and "the D'775 patent is invalid as anticipated by the BlackBerry Bold."  Wobbrock Decl. ¶ 51.

In response, BlackBerry contends that Typo makes conclusory arguments "but offers no admissible evidence of anticipation consistent with the applicable standard."  *Id*. at 9.  BlackBerry also asserts that the patent examiner specifically considered BlackBerry's D'578 Patent, on which the BlackBerry Bold is based, and issued the D'775 patent over the D'578 Patent without amendment.  *Id*.  BlackBerry rightly notes that establishing invalidity over the prior art "is even more difficult to meet if the asserted prior art was examined by the PTO and the patent issued over that art."  BlackBerry Reply at 9 (citing *Microsoft Corp. v. i4i Ltd. P'ship*, 131 S.Ct. 2238, 2249-51 (2011)).

Typo's anticipation argument does not meet its burden of raising a "substantial question" concerning the validity of the D'775 patent that would preclude issuance of a preliminary injunction.  *Amazon.com*, 239 F.3d at 1350.  Its conclusory assertion that the D'775 patent is invalid as anticipated by the BlackBerry Bold is insufficient, particularly given that the D'775 patent specifically issued over the D'578 Patent (whose design the BlackBerry Bold embodies).  Typo itself asserted that the examiner noted "differences in several design aspects between the application and the references," including that the D'775 patent, as compared to the D'578 patent, "contains plain elongated strips between the rows of keys ("frets"), (2) these frets extend outward to the right and left beyond the width of the keys, (3) has different proportions between the height of the frets compared to the height of the keys, and (4) the top three rows are straight while the lowest row of keys has a curve at the bottom."  Typo Opp. at 20.

### 4.  Invalidity — obviousness

"In addressing a claim of obviousness in a design patent, the ultimate inquiry is whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved."  *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1329 (Fed. Cir. 2012).  This involves a two-step process: "First, one must find a single reference, a something in existence, the design characteristics of which are basically the same as the claimed design.

United States District Court
Northern District of California

Second, other references may be used to modify the primary reference to create a design that has the same overall visual appearance as the claimed design. However, the secondary references may only be used to modify the primary reference if they are so related to the primary reference that the appearance of certain ornamental features in one would suggest the application of those features to the other." *Id.* 1329-30 (internal citations and punctuation omitted).

Typo's expert, Dr. Jacob Wobbrock, asserts that "[t]he prior art is rampant with keyboards that embody all of the claimed features of the D'775 design patent." Wobbrock Decl. ¶ 49. Dr. Wobbrock does not specify what this prior art is. He asserts that he has "reviewed a significant number of phones," photos of "some" of which are attached as Exhibit 2 to his declaration. Wobbrock Decl. ¶ 50. Dr. Wobbrock asserts that:

- There are several cell phones with the exact same contoured keys shown in the patent.
- There are several cell phones with rectangular keys arranged in four rows.
- There are several cell phones with equal size metallic "frets" in between rows, including
- BlackBerry's own "iconic" devices.
- There are several cell phones with keys that are evenly distributed across each row and centered along a vertical line.
- There are several cell phones with, along the vertical center line, adjacent sculpted keys that form a "v"-shaped pattern.
- There are several cell phones with a lower row of keys with a larger rectangular key centered vertically and having "u"-shaped planar area, and smaller keys that that a planar area and a raised area that creates a sculpted curve extending from the lower edge to the upper edge of the keys, curving away from the center line.
- There are several cell phones with a lower row of keys having a bottom edge that roughly follows the curvature of the bottom edge of the device.

Wobbrock Decl. ¶ 50. Dr. Wobbrock does not specify which of the phones he has reviewed fit into these categories. He concludes that "the D'775 patent is rendered obvious by the combination of any number of prior art designs, including BlackBerry's Bold design and a multitude of phones with "straight" keyboards that were on the market before 2012." Again, Dr. Wobbrock does not specify to which of the "any number of prior art designs" he refers.

BlackBerry argues that Typo failed to identify or analyze any prior art as a primary or secondary reference, "failed to provide the requisite explanation why a designer skilled in the art

United States District Court
Northern District of California

would consider it obvious to combine any reference, and fail[ed] to apply the ordinary observer standard against any combination at all."  BlackBerry Reply at 10.  It further contends that "even if all the various individual design elements of the D'775 were shown to be in the prior art and BlackBerry's prior designs—which they are not—this alone cannot establish invalidity.  Novel design can be created using elements already known in the art."  *Id.*

Typo's bald assertion that a combination of "any number of prior art designs" and a "multitude of phones with 'straight' keyboards" renders the D'775 patent obvious is not sufficient to show a likelihood of establishing that the D'775 is invalid for obviousness.  Typo does not identity a primary or secondary reference.  Dr. Wobbrock does not explain what features of which prior art references would be combined to create the D'775 patent, nor why it would be obvious for someone skilled in the art to do so.  It is not the Court's responsibility to determine which features of the alleged prior art would be obvious to combine to create the design claimed in the D'775 patent.  Typo's obviousness argument fails.

**B.  '964 Patent**

1.  Claim construction

The parties dispute whether the '964 Patent requires claim construction.

The claims at issue are:

Claim19.  A keyboard for use with a mobile communication device, the keyboard configured in a device housing having a top surfaces the top surface having a left edge and a right edge and being bisected by a vertical reference substantially midway between the left edge and the right edge,

[Claim 19 limitation A:] the keyboard having twenty-six letter keys and at least one other key,

[Claim 19 limitation B: ] the twenty six letter keys and the at least one other key being arranged in an upper row, a middle row, and a lower row,

[Claim 19 limitation C:] the letter keys in of the upper row being distributed across the top surface from adjacent the left edge to adjacent the right edge,

[Claim 19 limitation D:] a letter key in the middle row being adjacent the left edge of the housing and the keys in the middle row being distributed across the top surface of the housing from adjacent the left edge to adjacent the right edge,

[Claim 19 limitation E:] the keys in each of the upper, middle and lower rows being arranged so that approximately half of the keys in each of the respective rows are positioned to the left of the vertical reference and approximately half of the keys in each of the respective rows row are positioned to the right of the vertical reference, five letter keys in the upper row being disposed on each side of the vertical reference, five letter keys in the middle row being disposed on one side of the vertical reference and four letter keys in the middle row being disposed on the other side of the vertical reference, and four letter keys in the lower row being disposed on the one side of the vertical reference line and three letter keys in the lower row being disposed on the other side of the vertical reference line; and

[Claim 19 limitation F:] each letter key in the lower row being substantially vertically aligned with a respective letter key in each of the upper and middle rows.

Claim 20. The keyboard of claim 19 wherein each of the upper and middle rows has the same total number of keys.

Claim 24. The keyboard of claim 19 in which at least two of the rows have the same number of total keys.

BlackBerry argues that no claim construction is necessary because the claims use simple, clear terms whose plain and ordinary meanings are widely understood. BlackBerry also states that the claims relate to the mechanical aspects of a keyboard, a universally known product. *Id.* Typo argues that claim 19 requires construction of two terms: "device" and "bisected by a vertical reference." Opp'n 13.

Typo proposes that "device" be construed as a "messaging device." It argues that "device . . . is a term that courts regularly construe," but it only cites one case involving construction of the term "device." Typo Opp. at 12 (citing *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559-61 (Fed. Cir. 2013) *cert. denied,* 134 S. Ct. 1023 (U.S. 2014). But *Saffran* involved a prosecution disclaimer that limited the meaning of the term "device," which is not the case here. *Saffran*, 712 F.3d at 559 ("We conclude that Saffran's statements during prosecution of the '760 patent limit "device" to a continuous sheet."). Typo does not explain why, *in this case*, construction is necessary.

I find that "device" is a term that is readily understood and does not require construction. In addition, Typo's proposed construction—a "messaging device"— is not supported by the claims. Claims 1 through 4 specifically claim a "messaging device," whereas claim 19 claims, in relevant part, "a keyboard configured in a device housing . . .," suggesting that the patentee

1    deliberately chose not to use the term "messaging device" in claim 19.[7]

2           Typo argues that "bisected by a vertical reference" "would mean absolutely nothing to a

3    layperson" and that a "reference . . . is nothing unto itself, certainly nothing that can do any

4    'dividing' of physical things."  Typo Opp. at 14.  It proposes that the term be construed as a

5    "distinct physical vertical aspect that physically divides approximately half of the keys positioned

6    to the left and approximately half the keys positioned to the right."  Typo Opp. at 12-14.

7    BlackBerry responds that Typo's proposed construction "imports limitations (e.g., 'distinct,'

8    'physical,' and 'physically divides') unsupported by any intrinsic or extrinsic evidence."

9    BlackBerry Reply at 7.  BlackBerry further argues that a physical aspect is not required because

10   "Figures 2 and 3 [shown below] support a virtual reference line used to show the relative

11   placement of the keys."  *Id*.



19           I agree with Typo that "bisected by a vertical reference" would be confusing to a layperson

20   and needs to be construed.  I disagree with its proposed construction.  In particular, the vertical

21   reference does not have to be something that physically divides the keyboard.  Notably, Figures 2

22   and 3 do not show a *physical* dividing line.  But the figures do show that approximately half the

23   keys are positioned on the left side of the vertical midpoint of the keyboard, with the keys tipped

24   away from the vertical midpoint, and approximately half the keys are positioned to the right of the

26   ─────────────

     [7] BlackBerry argues that the Typo keyboard infringes even under Typo's proposed construction of

27   a device as a "messaging device" because the Typo keyboard is configured in a "messaging device
     housing," i.e. housing for the iPhone.  Typo Reply at 8.  While I find this persuasive, I need not

28   reach this argument because I decline to construe the term "device."

1   vertical midpoint, with the keys also tipped away from the vertical midpoint.  This creates a

2   vertical reference.  I therefore find that "bisected by a vertical reference" refers to a physical or

3   virtual line running vertically across the face of the keyboard.  I construe "bisected by a vertical

4   reference" as "divided in two along a physical or virtual vertical line that refers to a location on the

5   keyboard."  I construe "vertical reference" and "vertical reference line" as "physical or virtual

6   vertical reference line."

7          2.  Infringement[8]

8          BlackBerry argues that it will likely prove that the accused Typo keyboard literally

9   infringes[9] at least claims 19, 20, and 24 of the '964 patent.  Literal infringement of a claim exists

10  when every claim limitation "reads on"—or, in other words, is found in—the accused product.

11  *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002).

12         The declaration of Professor David Rempel includes a detailed infringement analysis

13  describing how the Typo Keyboard literally meets claims 19, 20, and 24 of the '964 Patent.  *See*

14  Rempel Decl. ¶¶ 62-101.  In opposition, Typo argues that BlackBerry is unlikely to prove

15  infringement of the asserted claims of the '964 Patent because the "Typo keyboard (1) is a

16  keyboard and not a messaging device, and (2) is in no way 'bisected by a vertical reference'"

17  because it does not feature a physical separation bisecting the keyboard's left and right halves.

18  Opp. at 15.  Typo's first argument fails because Claim 19 (and dependent claims 20 and 24) are

19  directed at "[a] keyboard for use with a mobile communication device," not the mobile

20  communication (or messaging) device itself.  '964 Patent 8:15-16.  Typo's second argument relies

21

22  _____

23  [8] On the record before me, I reject Typo's argument that BlackBerry's infringement claims are
    barred by the doctrine of equitable estoppel because BlackBerry "has declined to enforce the '964
24  Patent and the D'775 Patent against any of the over 40 cell phones that have been on the market
    since 2005 that infringe its interpretation of these patents."  Typo Opp. at 22.  There is no evidence
25  that BlackBerry, through misleading conduct, led Typo to infer that BlackBerry did not intend to
    enforce its patents against Typo.  There is also no indication that "over 40 cell phones that have
26  been on the market since 2005" infringe BlackBerry's patents.  Typo's reliance on the fact that
    BlackBerry did not sue those companies, if it did, was not reasonable.
27
    [9] BlackBerry does not raise the issue of infringement under the doctrine of equivalents in this
28  motion but states that it reserves the right to do so in this litigation.  BlackBerry Mot. at 14 n.5

United States District Court
Northern District of California

1  on its proposed construction of "bisected by a vertical reference," which I have rejected.

2      For the reasons given by Professor Rempel, as stated in the following chart, I find that

3  Typo has shown a likelihood of proving that the Typo keyboard literally infringes claims 19, 20,

4  and 24 of the '964 patent:[10]

5

| '964 Patent | Typo Keyboard |
|---|---|
| Claim19.  A keyboard for use with a mobile communication device, the keyboard configured in a device housing having a top surfaces the top surface having a left edge and a right edge and being [divided in two along a physical or virtual vertical line that refers to a location on the keyboard] substantially midway between the left edge and the right edge, | The Typo keyboard is a keyboard for use with a mobile communication device (an iPhone). It is configured in a device housing having a top surface, the top surface having a left[11] edge and a right edge (the Typo case within which the iPhone is placed).  The Typo keyboard is split by a virtual vertical reference line substantially midway between the left edge and the right edge.  As noted above, there is no requirement that this be a physical line; it is merely a line that refers to the vertical midpoint of the keyboard. |
| [Claim 19 limitation A:] the keyboard having twenty-six letter keys and at least one other key, | The Typo keyboard has 26 letter keys and at least one non-letter key. |
| [Claim 19 limitation B: ]the twenty six letter keys and the at least one other key being arranged in an upper row, a middle row, and a lower row, | The Typo keyboard features twenty six letter keys and at least one other key arranged in an upper row, a middle row, and a lower row. |
| [Claim 19 limitation C:] the letter keys in of the upper row being distributed across the top surface from adjacent the left edge to adjacent the right edge, | The letter keys in the upper row of the Typo keyboard are distributed across the top surface of the keyboard from adjacent to the left edge to adjacent to the right edge, i.e., the left most and right most letter keys in the upper row are next to the left and right edges, respectively, there are no non-letter keys between them and the edges. |
| [Claim 19 limitation D:] a letter key in the | A letter key in the middle row of the Typo |

---

[10] My constructions of the terms "bisected by a vertical reference," "vertical reference" and "vertical reference line" are inserted in brackets in the claim language in the left column

[11] In this chart, left and right are determined when looking at the keyboard.

15

United States District Court
Northern District of California

United States District Court
Northern District of California

| | |
|---|---|
| middle row being adjacent the left edge of the housing and the keys in the middle row being distributed across the top surface of the housing from adjacent the left edge to adjacent the right edge, | keyboard is adjacent to the left edge (the letter "A"), and the keys in the middle row of the Typo keyboard are distributed across keyboard from adjacent to the left edge to adjacent to the right edge . |
| [Claim 19 limitation E:] the keys in each of the upper, middle and lower rows being arranged so that approximately half of the keys in each of the respective rows are positioned to the left of the [physical or virtual vertical reference line] and approximately half of the keys in each of the respective rows row are positioned to the right of the [physical or virtual vertical reference line], five letter keys in the upper row being disposed on each side of the [physical or virtual vertical reference line], five letter keys in the middle row being disposed on one side of the [physical or virtual vertical reference line] and four letter keys in the middle row being disposed on the other side of the [physical or virtual vertical reference line], and four letter keys in the lower row being disposed on the one side of the [physical or virtual vertical reference line] and three letter keys in the lower row being disposed on the other side of the [physical or virtual vertical reference line]; and | The keys in the upper, middle and lower rows of the Typo keyboard are arranged so that approximately half of the keys in each of the respective rows are positioned to the left of the virtual vertical line (which is substantially midway between the left edge and the right edge), and approximately half of the keys in each of the respective rows row are positioned to the right of the virtual vertical reference line.<br><br>In the Typo keyboard, there are five letter keys in the upper row on each side of the virtual vertical reference line, five letter keys in the middle row on one side of the virtual vertical reference line (the left side) and four letter keys in the middle row on the other side (the right side), four letter keys in the lower row on one side of the virtual vertical reference line (the left side) and three letter keys on the other side (the right side). |
| [Claim 19 limitation F:] each letter key in the lower row being substantially vertically aligned with a respective letter key in each of the upper and middle rows. | Each letter key in the lower row of the Typo keyboard is substantially vertically aligned with a respective letter key both the upper and middle rows |
| Claim 20. The keyboard of claim 19 wherein each of the upper and middle rows has the same total number of keys. | The upper and middle rows in the Typo keyboard have the same number of keys (10). |
| Claim 24. The keyboard of claim 19 in which at least two of the rows have the same number of total keys. | The upper, middle, and lower rows in the Typo keyboard all have the same number of keys (10). |

### 3.   Invalidity—obviousness

To prove obviousness, a plaintiff must prove that "the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406 (2007).

16

This requires consideration of "(1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention at the time of invention, (3) the level of ordinary skill in the art, and (4) the objective indicia of nonobviousness." *Eli Lilly and Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1377 (Fed. Cir. 2006). The scope is not just any prior art, but art that is "reasonably pertinent to the particular problem with which the invention was involved." *Ruiz v. A.B. Chance Co*., 234 F.3d 654, 664 (Fed. Cir. 2000). Obviousness requires an "explicit" rationale as to why one of ordinary skill in the art would have "combine[d] the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418-19. Using hindsight in the obviousness analysis is forbidden. *Id.* at 421. The burden of establishing obviousness is heavier where the defendant cites prior art already considered during prosecution. *See Microsoft*, 131 S.Ct. at 2251.

Secondary considerations of non-obviousness may often be the most "probative and cogent evidence [of nonobviousness] in the record." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1375, 1364 (Fed. Cir. 2011) (citations omitted). Secondary considerations include (i) the invention's commercial success, (ii) long felt but unresolved needs, (iii) the failure of others to make the invention, (iv) praise by others, (v) teaching away by others, and (vi) copying of the invention by competitors. *See, e.g., Ecolochem, Inc. v. S. California Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000).

Typo argues that "a variety of prior art, such as the combination of U.S. Patent No. 6,049,796 to Siitonen or any other QWERTY keyboard setup and any of a variety of Smith Corona products manufactured in the late 1980s such as the Spell Mate or the Spell Right" renders the '964 Patent obvious. Typo Opp. at 3. Typo argues that early typewriters, like the 1937 Corona, incorporated the QWERTY keyboard and contained most of the limitations of claim 19.[12]

---

[12] According to Typo, "the 1937 Corona typewriter has "a keyboard configured in a housing; the keyboard has 26 letters and at least another key; the twenty six letters and another key are arranged in three rows; and the letters in the top row are distributed across the top surface. A letter key in the middle row is not adjacent to the left edge, but the keyboard complies with the 5/5-5/4-4/3 configuration and the requirement that the keys in the third row be "substantially aligned" with the top two rows."

*Id.* at ¶ 39.  Typo argues that both the Smith Corona Spell Right and Spell Mate products, which are handheld pocket electronic dictionaries, meet all but one of the elements of claim 19.[13]  *Id.* at ¶¶ 35-36, 40.  Typo also argues that "[t]he examiner would have rejected claim 19 entirely had he been made aware of the Spell Mate as prior art."  Typo Opp. at 6.

In response, BlackBerry argues that "Typo never identifies the relevant art to which the '964 Patent pertains."  BlackBerry notes that the '964 patent is "directed to an input device that is oriented to be used *substantially through use of the thumbs* . . . by providing a keyboard with a *minimal number of keys [that] are placed . . . to maximize the surface area of the thumb hitting the key* and to provide the user with a comfortable position of the hands for data input."  BlackBerry Reply at 3 (citing '964 patent 1:44-65 (emphasis added in brief)).  Accordingly, BlackBerry argues that the pertinent prior art is limited to small handheld communication devices and does not include all QWERTY keyboards or the Smith Corona Spell Mate and Spell Right devices, as Typo argues, because those devices "were not used for electronic communication, nor were they intended for use with small handheld electronic devices designed to be carried at all times."  *Id.*

BlackBerry also argues that "Typo provides no rationale as to why one of ordinary skill in the art would have combined the element of any of the prior art it identifies."  *Id.*  BlackBerry argues that it would not be obvious for one skilled in the art looking to solve the problems to which the '964 Patent is directed to combine the Spell Right or Spell Mate with either the Siitonen or a traditional QWERTY to create the '964 patent because "neither the Spell Right or Spell Mate are mobile communication devices, and they were not limited in surface space in the same way as the devices that are the subject of the '964 patent."  BlackBerry Reply at 4.  BlackBerry also asserts that "[t]he Spell Right and Spell Mate were also not intended for communicating in sentences, but were instead designed for typing individual words or equations on a larger form factor device."  *Id.*

BlackBerry also argues that the Siitonen keyboard and a traditional QWERTY keyboard have keys that are horizontally offset from other keys above, unlike the claims at issue, and neither

---

[13] These products do not have a 4/3 configuration in the lowest row.

United States District Court
Northern District of California

the Siitonen keyboard nor the Smith-Corona devices include letters keys that are adjacent to the right and left edges of the device, as required by the claims. *Id.* Lastly, BlackBerry argues that Typo fails to rebut at least three factors of secondary indicia of non-obviousness raised by BlackBerry: industry acceptance, long-felt but unresolved need, and Typo's deliberate copying of the BlackBerry keyboard design. *Id*.

Typo's obviousness argument does not raise a "substantial question" concerning the validity of the D'775 patent. *Amazon.com*, 239 F.3d at 1350. Typo does not explain why one skilled in the art would look to the prior art identified by Typo in order to solve the particular problem to which the '964 patent is directed—using minimal space "to provide the user of the hand-held device with the ability to input data with a minimal amount of key strokes and optimized for use substantially with the thumbs," '964 Patent 1:27-29. The prior art identified by Typo does not appear pertinent to that problem as it includes non-portable devices or portable dictionaries not intended for communication and which did not face similar space constraints. In addition, Typo has not presented evidence that someone skilled in the art would be motivated to combine the prior art cited by Typo to resolve the problem addressed in the '964 patent. *See, e.g.*, *KSR*, 550 U.S. at 418 (there should be an "explicit" analysis of "whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue"); *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("rejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness").[14]

## II. IRREPARABLE HARM

A plaintiff seeking a preliminary injunction "must make a clear showing that it is at risk of

---

[14] I also find that Typo has not created a substantial question regarding the '964 patent's validity for lack of written description or indefiniteness. Figures 2 and 3 of the specification provide adequate written description for the placement of the keys, including the vertical reference. *See, e.g.*, *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1564 (Fed. Cir. 1991) ("drawings alone *may* be sufficient to provide the "written description of the invention" required by § 112"). The '964 is not indefinite because someone skilled in the art would understand that the term "vertical reference line" refers to the "vertical reference" in the preamble. Typo has not asserted that it could mean anything else.

United States District Court
Northern District of California

irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple Inc. v. Samsung Electronics Co., Ltd.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm." *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

BlackBerry makes several arguments for why it will be irreparably harmed if an injunction does not issue. BlackBerry Mot. at 19-24. First, it contends that because of the similarity between the Typo keyboard design and the BlackBerry keyboard design, the Typo keyboard product causes confusion for current and potential BlackBerry customers and creates the misimpression in the marketplace that BlackBerry approves Typo's product. Moreover, because the Typo keyboard is allegedly inferior[15] to the BlackBerry keyboard, the "distribution of such an inferior product with the unique design cues intrinsic to BlackBerry will indelibly harm BlackBerry's goodwill with its customers." *Id.*

Second, BlackBerry argues that "Typo's business model is predicated on persuading those who prefer BlackBerry to forgo buying a BlackBerry in favor of an add-on keyboard for the iPhone." *Id.* at 22. BlackBerry states that it has a strong market share in the sub-market for smartphones with physical keyboards but that iPhones lead in market share of the overall smartphone market in the United States. BlackBerry argues that the Typo keyboard erodes BlackBerry's advantage in the sub-market for smartphones with physical keyboards because it allows the iPhone to compete directly for the customers who want a physical keyboard. BlackBerry argues that each sale lost because of the Typo keyboard has an "incalculable impact on BlackBerry's customer base." It asserts that once a consumer adopts or transitions to an iPhone (with a Typo keyboard) instead of a BlackBerry, "it becomes extremely difficult to transition [the customer] back to BlackBerry" because of brand loyalty, smartphone subsidies from wireless carriers, fixed term service plans (typically lasting two years), and the customer's investment of

_____

[15] BlackBerry cites various reviews critical of the Typo keyboard's performance. *See* Lynch Exs. 36-38.

1  time and resources in the iPhone.

2      In opposition, Typo asserts that BlackBerry is losing market share and that the BlackBerry

3  Q10 was not successful because of troubles with the BlackBerry brand and products that have

4  nothing to do with the Typo keyboard.  *See, e.g.,* Typo Reply at 24 ("As of late, a typical headline

5  regarding BlackBerry reads more like an obituary than anything else: "BlackBerry Handsets are

6  Nearly Extinct.") (citing Hallier Decl. ¶ 49).  Typo therefore suggests that BlackBerry has limited

7  goodwill to lose.

8      Typo also claims that BlackBerry cannot lose sales to the Typo keyboard because the Typo

9  keyboard does not compete with BlackBerry's phones: "Purchasers of the Typo keyboard are

10  iPhone owners who are looking for a case with a removable keyboard. They are *not* purchasers of

11  cell phones."  Typo Reply at 24 (emphasis in original).  According to Typo, the Typo keyboard is

12  sold exclusively through Typo's website and BlackBerries are sold through BlackBerry's website

13  and in retail stores.  The Typo keyboard and a BlackBerry are never sold in the same store or on

14  the same website, Typo argues, so "there is no evidence that anyone wishing to purchase a

15  BlackBerry would even be introduced to the Typo keyboard, as each product's purchaser would

16  likely do a very different online search."  *Id.*

17      Lastly, Typo contends that it is "unfeasible" that it, a small start-up company "could

18  seriously pose any threat to BlackBerry's market share or goodwill."  Typo asserts that it has

19  4,000 units of its keyboard and if it is found to have infringed, "BlackBerry's market share will be

20  exactly what it is with or without Typo, plus or minus a fraction of the 4,000 units sold by Typo."

21  *Id.* at 25.[16]

22      I find that BlackBerry has made the requisite showing of irreparable harm.[17]  BlackBerry

---

[16] Typo also argues that there is no irreparable harm because BlackBerry is abandoning the consumer market, which is the market that Typo is targeting.  BlackBerry persuasively refuted the assertion that it is abandoning the consumer market.  *See* Lynch Reply Decl. Ex 1.

[17] This is not a case like *Apple Inc. v. Samsung Electronics Co., Ltd.*, where "the accused product includes many features of which only one (or a small minority) infringe."  695 F.3d at 1374.  On the contrary, BlackBerry has shown a likelihood of proving that the dominant portion of Typo's keyboard infringes.  There is therefore no need to show that the harm is sufficiently related to the infringement; that "causal nexus" is implicit in this case.

has convincingly shown that BlackBerry's keyboard designs are a key driver of demand and goodwill for BlackBerry phones. *See* Douglas Decl. ¶¶ 4-13. Typo's keyboard directly targets the segment of smartphone users that prefer a physical keyboard, the market in which BlackBerry competes. Indeed, Typo's founder has openly explained that the catalyst for the Typo keyboard was the realization that many people carry two phones, one for typing and correspondence (the features that drive demand and goodwill for the BlackBerry) and an iPhone for everything else. Lynch Decl. Ex. 4. To the extent that Typo succeeds in allowing users to replace their phone for "typing and correspondence" with a Typo keyboard coupled with an iPhone, it likely does so at the expense of BlackBerry.[18] Further, at oral argument, counsel for Typo conceded that Typo was not limiting its production to 4,000 units, so its assertion that it cannot harm BlackBerry because it has only sold 4,000 products is inapt. Dkt. No. 35 at 63:5-9. Given the nature of the smartphone market, including phones subsidized by carriers, service plans that lock in customers, and brand loyalty, the monetary harm to BlackBerry cannot be adequately calculated and the loss of goodwill and loss of business opportunities is likely irreparable.

Finally, Typo's argument that BlackBerry sales are falling and that the company faces troubles unrelated to the Type keyboard may be true, but they do not change the fact that whatever demand or goodwill BlackBerry has, it is closely tied to its keyboard designs. I reject Typo's contention that BlackBerry is not irreparably harmed because it is already struggling and losing market share. To hold otherwise would prevent struggling companies from obtaining injunctions at the time when they may be the most vulnerable to harm from infringing conduct.

### III. BALANCE OF EQUITIES

Typo asserts that "[i]f it is not allowed to fulfill its remaining orders, Typo will be put out of business and the significant investment into its research and development will be all for nothing." Typo Opp. at 26. But the Federal Circuit has stated that the fact that an injunction might put an alleged infringer out of business "cannot justify denial of that injunction." *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986). The court

---

[18] Of course, if Typo introduces a non-infringing keyboard which succeeds in taking customers from BlackBerry, that is not a concern for patent law.

United States District Court
Northern District of California

1   explained that "[o]ne who elects to build a business on a product found to infringe cannot be heard

2   to complain if an injunction against continuing infringement destroys the business so elected."

3   *See also eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1069 (N.D. Cal. 2000) (same).

4   Given the likelihood of irreparable harm to BlackBerry, the balance of equities supports granting

5   an injunction.

6   **IV. PUBLIC INTEREST**

7   "Typically, in a patent infringement case, although there exists a public interest in

8   protecting rights secured by valid patents, the focus of the district court's public interest analysis

9   should be whether there exists some critical public interest that would be injured by the grant of

10   preliminary relief." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988).  Typo

11   argues that a preliminary injunction will harm the public interest because "Typo's innovative

12   keyboard technology will benefit consumers who have been in search of a satisfactory means of

13   typing on the iPhone."  Typo Opp. at 26-27.  But the mere fact that the allegedly infringing

14   product may offer some benefit to consumers, without more, is not a "critical public interest" that

15   precludes issuance of a preliminary injunction.  In this case, the public interest in protecting valid

16   patents outweighs any purported benefit to consumers that the Typo keyboard provides.

17   **V.  BOND**

18   As a condition of the preliminary injunction and pursuant to Federal Rule of Civil

19   Procedure 65(c), I will require BlackBerry to post security in an amount sufficient to secure

20   payment of any damages sustained by Typo if Typo is later found to have been wrongfully

21   enjoined. Therefore, Typo shall submit evidence concerning the proper amount of bond within

22   seven days of the date of this order. BlackBerry shall submit a response concerning the proper

23   amount of bond seven days thereafter.  Neither party's brief shall exceed five pages in length.  The

24   injunction shall not go into effect until BlackBerry posts the bond in the amount determined by the

25   court.

26   **CONCLUSION**

27   BlackBerry's motion for a preliminary injunction is GRANTED.  Dkt. No. 12.

28   BlackBerry's motion to file under seal is GRANTED.  Dkt. No. 11.

United States District Court
Northern District of California

23

Upon the posting of a bond by Blackberry, Typo Products LLC and its officers, agents, affiliates, employees, and attorneys, and all those persons acting or attempting to act in concert or participation with them,

ARE ENJOINED FROM:

a.   making, using, offering to sell, or selling within the United States, or importing into the United States, or marketing, promoting, or distributing Typo Products's Typo Keyboard Case, which is depicted in BlackBerry's moving papers, and any product that is no more than colorably different from these specified products and embodies any design contained in U.S. Design Patent No. D685,775; and

b.   making, using, offering to sell, or selling within the United States, or importing into the United States, or marketing, promoting, or distributing Typo Products's Typo Keyboard Case, and any product that is no more than colorably different from the specified products and infringes U.S. Patent No. 7,629,964.

Typo shall submit evidence concerning the proper amount of bond within seven days of this order.  BlackBerry shall submit a response concerning the proper amount of bond seven days thereafter.  Neither party's brief shall exceed five pages in length.

**IT IS SO ORDERED**.

Dated: March 28, 2014

_____

WILLIAM H. ORRICK
United States District Judge

United States District Court
Northern District of California